IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 3, 2012 Session

**PAUL DENNIS REID, JR. EX REL. LINDA MARTINIANO
v. STATE OF TENNESSEE**

**Tenn. R. App. P. 11 Appeal by Permission from the Court of Criminal Appeals
Circuit Court for Montgomery County
No. 38887     John H. Gasaway, III, Judge**

---

**No. M2009-00128-SC-R11-PD - Filed January 24, 2013**

---

AND

**PAUL DENNIS REID, JR. v. STATE OF TENNESSEE**

**Tenn. R. App. P. 11 Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Davidson County
Nos. 97-C-1836 & 97-C-1834     Cheryl Blackburn, Judge**

---

**Nos. M2009-00360-SC-R11-PD & M2009-01557-SC-R11-PD**

---

This appeal raises the question of whether a prisoner facing the death penalty has the mental capacity to abandon the pursuit of post-conviction relief in his three murder cases. After the prisoner decided not to seek a new trial in any of these cases, one of his sisters, in cooperation with the Office of the Post-Conviction Defender, filed a "next friend" petition in each of the prisoner's three murder cases, requesting the courts to declare the prisoner incompetent, thereby enabling her to pursue post-conviction relief on his behalf. The Criminal Court for Davidson County and the Circuit Court for Montgomery County conducted separate hearings in 2008. Each court denied the petitions after determining that the prisoner's sister and the Office of the Post-Conviction Defender had failed to establish by clear and convincing evidence that the prisoner lacked the capacity to make rational decisions regarding the pursuit of post-conviction relief. The Court of Criminal Appeals affirmed both of these judgments. *Reid v. State*, Nos. M2009-00128-CCA-R3-PD, M2009-00360-CCA-R3-PD, M2009-01557-CCA-R3-PD, 2011 WL 3444171 (Tenn. Crim. App. Aug. 8, 2011). We granted the prisoner's Tenn. R. App. P. 11 application. We have

determined that both trial courts employed the correct legal standard for determining whether the prisoner possessed the mental capacity to rationally forego seeking post-conviction relief and also that the prisoner's sister and the Office of the Post-Conviction Defender failed to prove by clear and convincing evidence that the prisoner lacked the capacity to make rational decisions regarding the pursuit of post-conviction relief. For the sake of consistency, we further hold that, in all future cases, Tennessee's courts should employ the mental competency standard of Tenn. Sup. Ct. R. 28, § 11(B) whenever the issue of a prisoner's competency to pursue post-conviction relief is properly raised.

**Tenn. R. App. P. 11 Appeals by Permission; Judgment of the Court of Criminal Appeals Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined.

Kelly A. Gleason and Bradley A. MacLean, Office of the Post-Conviction Defender, Nashville, Tennessee, for the appellants, Paul Dennis Reid, Jr. and Linda Martiniano.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; James E. Gaylord, Assistant Attorney General, for the appellee, State of Tennessee.

Christopher Brett Jaeger, J. Patrick Warfield, and Gregory D. Smith, Nashville, Tennessee, for the Amici Curiae, Jerry P. Black, Terry A. Maroney, Steven J. Mulroy, Christopher Slobogin, Jeffrey Usman, and Penny J. White.

## OPINION

### I.

Paul Dennis Reid, Jr. is currently facing seven sentences of death. Two juries in Davidson County and one jury in Montgomery County convicted him of three sets of execution-style murders, of seven persons total, that occurred within a two-month period in 1997 at three fast food restaurants in Middle Tennessee.

Mr. Reid is also a human conundrum. On one hand, he is undeniably brain-damaged. A lesion on his left temporal lobe interferes with his ability to communicate and possibly compromises his grip on reality. Mr. Reid claims that he subscribes to a series of elaborate delusions in which he is the subject of constant government surveillance and remote mind control. He insists that his trials were mock trials, that the attorneys representing him were actors, and that his death sentence was actually a secret ten- to twelve-year sentence. In

addition, he has claimed that he is engaged to a woman who his psychiatrists believe is a figment of his imagination. He has also displayed a penchant for making peculiar statements, particularly to his own legal team.

On the other hand, Mr. Reid has told several mental health professionals over the years that his delusions are actually an elaborate, self-serving hoax that he has successfully employed to avoid prosecution in the past. The question at the core of this case is this: Is Paul Reid a mentally ill man who tries to appear sane or a sane man who tries to appear mentally ill? Does he truly believe he is trapped in an Orwellian nightmare of government surveillance and thought control, or are his delusions more like an elaborate piece of performance art used to gain attention and to amuse himself in prison? Perhaps it is a bit of both. Paul Reid's psyche has proved to be a tough nut to crack.

The procedural history following Mr. Reid's convictions is labyrinthine. Mr. Reid's cases have presented more than one issue of first impression. This Court, the Court of Criminal Appeals, and the trial courts have been required to construct new rules and procedures along the way. Today, at a unique juncture in this litigation, all three of Mr. Reid's cases are before this Court. We granted his Tenn. R. App. P. 11 application because these cases will enable us to address and realign the standards courts use to determine the competency of petitioners seeking relief from a judgment under the Post-Conviction Procedure Act.

As the law now stands, Tennessee courts apply one standard for determining whether a capital post-conviction petitioner has the mental capacity to withdraw a previously filed petition for post-conviction relief. However, the courts apply another standard for determining a petitioner's capacity with regard to due process tolling of the statute of limitations for filing a post-conviction petition or for determining whether a "next friend"[1] should be permitted to pursue post-conviction relief on the petitioner's behalf. While these two standards are worded differently, we have come to believe that they really are – or at least should be – asking the same question. Accordingly, this opinion enables us to articulate a single competency standard applicable to all phases of a post-conviction proceeding.

---

[1]The role of "next friend" is described in Tenn. R. Civ. P. 17.03. A "next friend" is simply a "duly appointed representative" who is authorized by the court to litigate on behalf of a minor or an incompetent person. A "next friend" is a fiduciary, similar to a guardian or conservator. Although the Tennessee Rules of Civil Procedure do not apply in post-conviction cases, Tenn. Sup. Ct. R. 28, § 3(B), we have recognized the traditional role of "next friends" in all legal proceedings as a feature of the common law. *See Holton v. State*, 201 S.W.3d 626, 631-35 (Tenn. 2006).

## II.

Mr. Reid was born with hearing loss caused by a deformed ear. He had an unstable childhood.[2] After his parents divorced when he was three years old, Mr. Reid and one of his sisters continued to live with his father and paternal grandmother. He sustained head trauma on a number of occasions during his developmental period, including one occasion when he was hit on the side of his head with a brick.[3]

By the age of four or five, Mr. Reid was causing problems in the neighborhood and was seriously misbehaving at home. On one occasion, he set fire to his grandmother's bed while she was in it. On another occasion he beat his grandmother's dog to death with a baseball bat. Mr. Reid returned to live with his mother and his other sister after his mother learned that his father was planning to put him up for adoption. However, when he was sixteen years old, Mr. Reid was asked to leave his mother's house because he had attempted to sexually assault both his mother and sister. From that time on, Mr. Reid was basically on his own.[4]

Mr. Reid's brushes with the law steadily became more serious as time passed. His juvenile record included charges of automobile theft, simple assault, and check forgery.[5] In 1982, he was charged with committing several armed robberies in Texas. He was never tried on these charges because he was hospitalized after being found to be incompetent.[6] In 1984, Mr. Reid was convicted in Texas of aggravated robbery.[7] The assistant district attorney who prosecuted Mr. Reid in that case testified that during these proceedings, Mr. Reid "performed antics" whenever the jury was present but "stopped 'putting on' when the jury was not in the courtroom."[8] Years later, Mr. Reid bragged that he had "fooled the shrinks" to one of the

---

[2]*State v. Reid*, 213 S.W.3d 792, 819-20 (Tenn. 2006); *State v. Reid*, 91 S.W.3d 247, 267 (Tenn. 2002).

[3]*State v. Reid*, 164 S.W.3d 286, 302 (Tenn. 2005); *State v. Reid*, 91 S.W.3d at 268.

[4]*State v. Reid*, 91 S.W.3d at 267.

[5]*State v. Reid*, 91 S.W.3d at 266-268.

[6]*State v. Reid*, 91 S.W.3d at 268, 287.

[7]*State v. Reid*, 213 S.W.3d at 818; *State v. Reid*, 91 S.W.3d at 268, 287.

[8]*State v. Reid*, 91 S.W.3d at 270.

psychologists who testified on his behalf in the three cases currently before this Court.[9] He also told another psychologist that he had "faked delusions in the past."[10]

At some point, Mr. Reid moved to Tennessee to pursue a career in country music.[11] Even though he found employment at a Shoney's restaurant, he experienced financial difficulties. He discussed with two fellow employees how he could obtain money by robbing a fast food restaurant at night when there would be no witnesses, and he sought their assistance in obtaining a pistol.[12] Despite his financial problems, Mr. Reid quit his job at Shoney's in early February 1997. He was given no severance pay and had no other job.[13]

Early on the morning of February 16, 1997, Steve Hampton and Sarah Jackson were forced to the floor and fatally shot from behind as they were preparing to open the Captain D's fast food restaurant on Lebanon Road in Donelson. The restaurant was approximately 2.1 miles from the Shoney's restaurant where Mr. Reid had been employed. Approximately $7,000 was taken from the restaurant, as well as Mr. Hampton's wallet containing $600.[14]

On March 23, 1997, a McDonald's fast food restaurant on Donelson Pike in Hermitage was robbed at closing time. Three employees, Andrea Brown, Robert Sewell, and Ronald Santiago, were murdered execution-style. A fourth employee, Jose Ramirez Gonzales, would also have been murdered, but the assailant's pistol jammed. The assailant stabbed Mr. Gonzales repeatedly and left him for dead, after taking the contents of the restaurant's safe. Even though Mr. Gonzales was seriously wounded, he was able to call 9-1-1 for help.[15] Mr. Gonzales later testified as a key witness against Mr. Reid.[16]

---

[9]*State v. Reid*, 164 S.W.3d at 305.

[10]*State v. Reid*, 164 S.W.3d at 305.

[11]*State v. Reid*, 213 S.W.3d at 806.

[12]*State v. Reid*, 213 S.W.3d at 806; *State v. Reid*, 164 S.W.3d at 299-300; *State v. Reid*, 91 S.W.3d at 264.

[13]*State v. Reid*, 213 S.W.3d at 806, 814; *State v. Reid*, 164 S.W.3d at 300; *State v. Reid*, 91 S.W.3d at 262, 264.

[14]*State v. Reid*, 91 S.W.3d at 261-62.

[15]*State v. Reid*, 213 S.W.3d at 805.

[16]*State v. Reid*, 213 S.W.3d at 805-06, 824.

On April 23, 1997, the Baskin-Robbins ice cream shop on Wilma Rudolph Boulevard in Clarksville was robbed around closing time. When the authorities arrived, the two employees could not be found, but the cash register was open and the top of the safe had been removed.[17] On April 24, 1997, the bodies of the two employees, Angela Holmes and Michelle Mace, were discovered at the Dunbar Cave State Natural Area. Both victims had received deep stab wounds to their necks, as well as stab wounds, cuts, and abrasions to other parts of their bodies. They had bled to death.[18]

On June 12, 1997, Mr. Reid was arrested after attempting to kidnap the manager of a Shoney's restaurant in Cheatham County.[19] At that time, he was enrolled as a student at Volunteer State Community College and was unemployed.[20] Mr. Reid was eventually charged with and indicted for (1) the robbery of the Captain D's restaurant and the murders of Mr. Hampton and Ms. Jackson, (2) the robbery of the McDonald's restaurant and the murders of Ms. Brown and Messrs. Sewell and Santiago, and (3) the robbery of the Baskin-Robbins shop and the murders of Msses. Holmes and Mace.

In 1999, Mr. Reid was tried in Davidson County for the crimes he committed at the Captain D's restaurant in Donelson. No issue was raised regarding his competence to stand trial during this proceeding. However, during the penalty phase of the trial, Mr. Reid presented mitigation evidence regarding his childhood, the damage to the left frontal lobe of his brain caused by repeated trauma to his head, and the diagnoses of his current psychological conditions.[21] The jury sentenced Mr. Reid to death for the murders of Mr. Hampton and Ms. Jackson, and the trial court imposed a 25-year sentence for his especially aggravated robbery conviction to be served consecutively to his two death sentences.[22]

Later in 1999, Mr. Reid was tried in Montgomery County for the crimes he committed relating to the robbery of the Baskin-Robbins shop in Clarksville. Eight days before trial, Mr. Reid asserted that he was not competent to stand trial. To support this claim, he

---

[17]*State v. Reid*, 164 S.W.3d at 297-98.

[18]*State v. Reid*, 164 S.W.3d at 298.

[19]*State v. Reid*, 91 S.W.3d at 261.

[20]*State v. Reid*, 91 S.W.3d at 268, 270.

[21]*State v. Reid*, 91 S.W.3d at 267-71.

[22]The Court of Criminal Appeals affirmed these convictions and sentences on May 31, 2001. *State v. Reid*, No. M1999-00803-CCA-R3-DD, 2001 WL 584283 (Tenn. Crim. App. May 31, 2001). This Court affirmed the convictions and sentences on November 26, 2002. *State v. Reid*, 91 S.W.3d 247 (Tenn. 2002).

presented the testimony of the same clinical neuropsychologist and clinical psychologist who had presented mitigation testimony at his earlier trial in Davidson County. After the State's psychiatrist and an independent psychiatrist appointed by the trial court opined that Mr. Reid was competent to stand trial, the trial court held that Mr. Reid had failed to prove that he was incompetent. During the penalty phase of the trial, Mr. Reid called four of the experts who had offered mitigation evidence in the Captain D's trial. The jury found Mr. Reid guilty of two counts of first degree premeditated murder, two counts of aggravated kidnapping, and one count of especially aggravated robbery and sentenced him to death for each of the first degree murder convictions.[23]

In 2000, Mr. Reid was tried in Davidson County for the crimes he had committed at the McDonald's restaurant in Hermitage. Following an extensive pretrial hearing, the trial court found that Mr. Reid was competent to stand trial. During the penalty phase of the trial, Mr. Reid presented the same four experts who had testified on his behalf in the Captain D's trial and the Baskin-Robbins trial. These experts discussed his unstable childhood, his history of brain trauma, and his current psychological condition. The jury convicted Mr. Reid of three counts of premeditated murder, three counts of felony murder, one count of attempted murder, and one count of especially aggravated robbery. The jury sentenced Mr. Reid to death for the murders of Ms. Brown and Messrs. Sewell and Santiago.[24]

When this Court affirmed Mr. Reid's convictions and sentences in the Captain D's case, we set an April 29, 2003 execution date.[25] On April 14, 2003, Mr. Reid wrote a 92-page letter addressed to the Governor, this Court, the Attorney General and Reporter, and the District Attorney General, stating that he did not intend to pursue his post-conviction remedies in the Captain D's case. At the conclusion of his letter, Mr. Reid stated that "[a]fter four (4) years of serious, meticulous consideration, I elect to discontinue any post-conviction appeal in the Captain D's case. . . . I accept the juries' [sic] verdict in the Capt. D's case, as well as the punishment imposed, death by lethal injection."

On April 22, 2003, this Court declined to stay Mr. Reid's execution. Thereafter, Mr. Reid's lawyers and Janet Kirkpatrick, one of his sisters acting as his "next friend," filed a

---

[23]The Court of Criminal Appeals affirmed the convictions and sentences on December 29, 2003. *State v. Reid*, No. M2001-02753-CCA-R3-DD, 2003 WL 23021393 (Tenn. Crim. App. Dec. 29, 2003). This Court affirmed the convictions and sentences on May 24, 2005. *State v. Reid*, 164 S.W.3d 286 (Tenn. 2005).

[24]The Court of Criminal Appeals affirmed these convictions and sentences on June 3, 2005. *State v. Reid*, No. M2003-00539-CCA-R3-DD, 2005 WL 1315689 (Tenn. Crim. App. June 3, 2005). This Court affirmed the convictions and sentences on December 27, 2006. *State v. Reid*, 213 S.W.3d 792 (Tenn. 2006).

[25]*State v. Reid*, 91 S.W.3d at 288.

petition for writ of habeas corpus in the United States District Court for the Middle District of Tennessee. Mr. Reid testified that he was not interested in pursuing habeas corpus relief. However, Ms. Kirkpatrick submitted reports from a psychiatrist and two psychologists, and argued that Mr. Reid was not competent to make that decision. The district court dismissed the "next friend" petition after concluding that Ms. Kirkpatrick had failed to establish a prima facie case that Mr. Reid was incompetent. On April 28, 2003, the United States Court of Appeals for the Sixth Circuit entered an order staying Mr. Reid's execution and remanding the case to the district court for a full hearing on Mr. Reid's competency.[26]

On April 28, 2003, just hours before his scheduled execution, Mr. Reid temporarily changed his mind about pursuing post-conviction relief and filed an 8-page pro se petition in the Criminal Court for Davidson County. As a result of this petition, the trial court stayed Mr. Reid's execution and appointed the Office of the Post-Conviction Defender to represent him. However, on September 29, 2003, Mr. Reid prepared a letter addressed to the trial court clerk stating that moments after the United States Court of Appeals stayed his execution, his attorney "encouraged me to sign a document which dealt with appealing the Captain D's case . . . however, I was not given the opportunity to read the document, nor actually fathom exactly what I signed." Mr. Reid continued, "I errored [sic] in signing the appeal document. Therefore, I elect to withdraw the appeal document I signed in the Captain D's case."

On November 30, 2004, the Post-Conviction Defender filed an amended petition on Mr. Reid's behalf in the Criminal Court for Davidson County. This amended petition was not signed or verified by Mr. Reid. Instead, the Post-Conviction Defender stated that he believed that Mr. Reid was "currently incompetent" and requested the trial court to declare Mr. Reid incompetent and to stay the post-conviction proceedings.[27] In an order dated January 10, 2005, the trial court scheduled a hearing to determine whether Mr. Reid was competent "to proceed at the post-conviction level" and announced a set of procedures to govern that hearing.[28] This procedure called for (1) using the competency standard articulated in *State v. Nix*, 40 S.W.3d 459, 463 (Tenn. 2001), and (2) placing the burden on

---

[26]*Kirkpatrick v. Bell*, 64 F. App'x 495 (6th Cir. 2003). The habeas corpus petition filed by Ms. Kirkpatrick was eventually dismissed by the agreement of the parties because Mr. Reid filed a petition for post-conviction relief in state court soon after the United States Court of Appeals remanded the case to the district court for a full hearing on Mr. Reid's competency. *Martiniano v. Bell*, 454 F.3d 616, 616-17 (6th Cir. 2006).

[27]*Reid v. State*, 197 S.W.3d 694, 697 (Tenn. 2006).

[28]*Reid v. State*, 197 S.W.3d at 697-98.

Mr. Reid to prove that he was incompetent by clear and convincing evidence.[29]  Both the Court of Criminal Appeals and this Court denied Mr. Reid's application for a Tenn. R. App. P. 10 extraordinary appeal.

On January 17, 2005, at the beginning of the evidentiary hearing, the Office of the Post-Conviction Defender filed a motion to continue, as well as a second amended petition for post-conviction relief.  Over the State's objection, the trial court granted Mr. Reid permission to pursue a Tenn. R. App. P. 9 interlocutory appeal from its January 10, 2005 order.  The Court of Criminal Appeals declined to grant the interlocutory appeal.  However, on June 26, 2005, this Court granted Mr. Reid permission to appeal.

Mr. Reid's execution date for his convictions in the Baskin-Robbins case was originally set for October 5, 2005.[30]  On September 23, 2005, while the interlocutory appeal in the Captain D's case was pending, the Office of the Post-Conviction Defender filed a motion in the Circuit Court for Montgomery County asking to be appointed to represent Mr. Reid in the post-conviction proceedings involving the Baskin-Robbins case.  The Office of the Post-Conviction Defender also filed a petition for post-conviction relief.  Like the amended petition filed in Davidson County in the Captain D's case, this petition was neither signed nor verified by Mr. Reid.  However, the Office of the Post-Conviction Defender asserted that it was its "firmly held opinion" and "good faith belief" that Mr. Reid was "mentally incompetent and unable to verify the petition or otherwise participate in the post-conviction action."[31]

On September 29, 2005, the trial court granted a stay of execution, appointed the Office of the Post-Conviction Defender to represent Mr. Reid, and stayed the proceedings in Montgomery County pending the disposition of Mr. Reid's incompetency claims in the Captain D's case.  The Court of Criminal Appeals denied the State's Tenn. R. App. P. 10 application for an extraordinary appeal from the September 29, 2005 order.  However, on November 29, 2005, this Court granted the State's application for an extraordinary appeal to address the requirements and procedure for considering a petition for post-conviction relief filed by a prisoner's "next friend" that has not been verified under oath or signed by the prisoner.[32]

---

[29]*Reid v. State*, 197 S.W.3d at 697-98.

[30]*State v. Reid*, 164 S.W.3d at 323.

[31]*Holton v. State*, 201 S.W.3d at 629.

[32]*Holton v. State*, 201 S.W.3d at 629-30.

On May 23, 2006, while the appeals involving the viability of the post-conviction proceedings in the Captain D's and Baskin-Robbins cases were pending, Linda Martiniano, Mr. Reid's other sister, filed a "next friend" petition in the Circuit Court for Montgomery County seeking post-conviction relief in the Baskin-Robbins case. She also filed a "next friend" petition in the United States District Court for the Middle District of Tennessee, seeking habeas corpus relief in the Baskin-Robbins case. On June 13, 2006, the trial court in Montgomery County dismissed Ms. Martiniano's "next friend" petition on the ground that she had failed to make a prima facie showing that Mr. Reid was incompetent.[33]

On June 22, 2006, this Court filed its amended opinion[34] in the Tenn. R. App. P. 10 appeal from the Montgomery County court's September 29, 2005 order. We held that post-conviction trial courts lack the authority to consider petitions for post-conviction relief that have not been signed or verified under oath by the prisoner, unless the petition was submitted by a qualified "next friend." In that regard, we held that a prisoner's "next friend" must make two threshold showings:

> First, a "next friend" must provide an adequate explanation –
> such as inaccessibility, mental incompetence, or other disability
> – why the real party in interest cannot appear on his own behalf
> to prosecute the action. . . . Second, the "next friend" must be
> truly dedicated to the best interests of the person on whose
> behalf he seeks to litigate . . ., and it has been further suggested
> that a "next friend" must have some significant relationship with
> the real party in interest.

*Holton v. State*, 201 S.W.3d at 632 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 163-64 (1990)).

We also held that in order to proceed under the theory that the prisoner is incompetent, the "next friend" must make a prima facie showing of incompetence by attaching to the petition "affidavits, depositions, medical reports, or other credible evidence that contain specific factual allegations showing the petitioner's incompetence." *Holton v. State*, 201

---

[33]The Court of Criminal Appeals later reversed the dismissal of Ms. Martiniano's petition and remanded the case to Montgomery County to determine whether Mr. Reid was competent under the *State v. Nix* standard. *Reid ex rel. Martiniano v. State*, No. M2006-01294-CCA-R3-PD, 2007 WL 1946652, at *10 (Tenn. Crim. App. July 3, 2007) (No Tenn. R. App. P. 11 application filed).

[34]This Court filed its original opinion on May 4, 2006. However, in response to a petition for rehearing, we withdrew that opinion and filed an amended opinion on June 22, 2006. *Holton v. State*, 201 S.W.3d at 626.

S.W.3d at 634 (quoting *State v. Nix*, 40 S.W.3d at 464). Once this prima facie showing is made, the trial court must conduct a hearing to determine whether the prisoner is incompetent. In doing so, we held, the trial court should utilize the civil competency standard of *State v. Nix* that inquires whether the petitioner is able to manage his personal affairs and understand his legal rights and liabilities. *See State v. Nix*, 40 S.W.3d at 463. Under this framework, we found that the Office of the Post-Conviction Defender's petition in the Baskin-Robbins case "failed to establish a basis for allowing the Defender to proceed as 'next friend'" because Mr. Reid "has never been found mentally incompetent by any court [in Tennessee]" and because the Office of the Post-Conviction Defender had failed to "make a prima facie showing of [Mr.] Reid's alleged current mental incompetency." *Holton v. State*, 201 S.W.3d at 635.

On June 26, 2006, this Court issued its opinion in the interlocutory appeal from the Davidson County court's June 10, 2005 order regarding the petitions for post-conviction relief in the Captain D's case. We affirmed the trial court's decision to conduct an evidentiary hearing into Mr. Reid's competency to pursue post-conviction relief. In doing so, we held that persons seeking to have a prisoner declared incompetent for the purposes of proceeding with a petition for post-conviction relief have the burden of proving by clear and convincing evidence that the prisoner is incompetent, *Reid v. State*, 197 S.W.3d at 703-05, and that the prisoner's competency should be determined using the civil competency standard articulated in *State v. Nix*. *Reid v. State*, 197 S.W.3d at 701-02.[35]

Even though the Montgomery County court had summarily dismissed her "next friend" petition for post-conviction relief, Ms. Martiniano fared better in federal court. On June 27, 2006, the district court conducted a hearing and determined that Ms. Martiniano had made a prima facie showing that Mr. Reid was incompetent. Accordingly, the district court stayed Mr. Reid's execution in the Baskin-Robbins case and ordered a full hearing on Mr. Reid's competency to pursue federal habeas corpus relief.[36]

The district court never conducted an evidentiary hearing to determine whether Mr. Reid was competent to pursue habeas corpus relief. At a status conference on August 24,

_____

[35]However, we disagreed with the Davidson County court regarding the effect of a finding of incompetence. The trial court had established a bifurcated procedure to determine which post-conviction claims could proceed without Mr. Reid's assistance. Rather, we held that if a person entitled to pursue post-conviction relief is found incompetent, the trial court should appoint a "next friend" or guardian ad litem to pursue post-conviction relief on behalf of the prisoner. *Reid v. State*, 197 S.W.3d at 696, 706.

[36]On July 7, 2006, the United States Court of Appeals for the Sixth Circuit denied the State's motion to vacate the stay of execution and remanded the case to the district court for further proceedings. *Martiniano v. Bell*, 454 F.3d at 617.

2006, the State withdrew its opposition to Ms. Martiniano proceeding as Mr. Reid's "next friend" in the habeas corpus proceeding. The State informed the district court that, based on a recent evaluation of Mr. Reid by its forensic neuropsychologist, it had concluded that "Mr. Reid is incompetent to make a rational decision to waive his capital appeals in accordance with the standards set forth in *Rees v. Peyton*."[37] The State later reaffirmed this concession in another "next friend" federal habeas corpus proceeding in which Ms. Martiniano challenged the constitutionality of Tennessee's lethal injection protocol.[38]

On July 3, 2007, the Court of Criminal Appeals reversed the Montgomery County court's dismissal of Ms. Martiniano's "next friend" petition and remanded the case with directions to conduct an evidentiary hearing to determine whether Mr. Reid was incompetent to pursue post-conviction relief on his own behalf.[39]

---

[37]The State was referring to *Rees v. Peyton*, 384 U.S. 312 (1966). Melvin Rees was convicted of murder in a Virginia state court and was sentenced to death. The federal district and circuit courts denied his petition for writ of habeas corpus, and his lawyer filed a petition for writ of certiorari in the United States Supreme Court. After Mr. Rees requested his lawyer to withdraw the petition, his lawyer refused and requested a mental examination for Mr. Rees. While retaining jurisdiction over the case, the Court remanded the matter to the district court to determine whether Mr. Rees possessed the "capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees v. Peyton*, 384 U.S. at 314. One year later, the Court put the case on hold indefinitely. *Rees v. Peyton*, 386 U.S. 989 (1967). The Court took no further action in the case for twenty-nine years, and Mr. Rees died in prison in 1995. *Rees v. Superintendent of Virginia State Penitentiary*, 516 U.S. 802 (1995) (dismissing the petition for writ of certiorari due to the death of Mr. Rees).

We have incorporated the competency standard of *Rees v. Peyton* into Tenn. Sup. Ct. R. 28, § 11, which applies when a petitioner facing the death penalty seeks to withdraw a previously filed petition for post-conviction relief. However, delays such as the twenty-nine year delay in *Rees v. Peyton* cannot occur under Tennessee law because we have held that when a prisoner lacks the capacity to pursue post-conviction relief, Tennessee courts must appoint a "next friend" or a guardian ad litem to pursue post-conviction relief on the incompetent prisoner's behalf. *Reid v. State*, 197 S.W.3d at 696, 705-06. *Cf. Ryan v. Gonzales*, Nos. 10-930, 11-218, __ U.S. __, __ S. Ct. __, 2013 WL 68690 (January 8, 2013) (holding that the disposition of Mr. Rees's case was not precedent-setting; federal courts should not stay habeas corpus proceedings during periods of petitioner incompetency).

[38]At a status conference on December 18, 2007, the State informed the district court that Mr. Reid's mental state fluctuated. Although it cautioned that Mr. Reid could become competent in the future, the State reaffirmed its concession that Mr. Reid was, at that time, incompetent under the *Rees* standard and that Ms. Martiniano could proceed as his "next friend."

[39]*Reid ex rel. Martiniano v. State*, No. M2006-01294-CCA-R3-PD, 2007 WL 1946652, at *10 (Tenn. Crim. App. July 3, 2007) (No Tenn. R. App. P. 11 application filed).

The Davidson County court conducted hearings on July 31, 2007, and September 4 and 5, 2007, regarding Mr. Reid's competence to withdraw his pro se post-conviction petition, pursuant to Tenn. Sup. Ct. R. 28, § 11. During these proceedings, the State did not concede that Mr. Reid was incompetent as it had in the habeas corpus hearings in the district court. In fact, the State vigorously asserted that Mr. Reid was competent under the *Rees v. Peyton* competency standard articulated in Tenn. Sup. Ct. R. 28, § 11(B)(1).[40]

On December 20, 2007, the Davidson County court filed an order addressing Mr. Reid's request to withdraw his pro se petition for post-conviction relief in the Captain D's case. The court declined to find definitively that Mr. Reid was incompetent; however, it declined to permit Mr. Reid to withdraw his pro se petition for post-conviction relief. In reaching its decision, the trial court noted that this proceeding was entitled to heightened scrutiny because it involved the death penalty and that the State had conceded in the federal habeas corpus proceedings that Mr. Reid was incompetent under the *Rees* standard.

On December 26, 2007, Ms. Martiniano filed a "next friend" petition in the Criminal Court for Davidson County seeking post-conviction relief for her brother in the McDonald's case. With the filing of this petition, the Davidson County court had two questions before it in the McDonald's case – whether Mr. Reid was incompetent between December 27, 2006, and December 26, 2007, to toll the post-conviction statute of limitations and, if so, whether Ms. Martiniano should be permitted to pursue post-conviction relief as her brother's "next friend." In addition, the Davidson County court had before it in the Captain D's case the question of whether Ms. Martiniano should be permitted to proceed as her brother's "next friend" and to file an amended petition for post-conviction relief. Similarly, the Montgomery County court had before it the question of whether Ms. Martiniano should be permitted to proceed as her brother's "next friend" in the Baskin-Robbins case.

---

[40]We note that the burden of proof regarding competency in federal courts differs from the burden of proof in our courts. In some federal courts, neither party bears the burden of proving competence or incompetence. Rather, the court must determine competence under the *Rees* standard by a preponderance of the evidence. *See Comer v. Schriro*, 480 F.3d 960, 970 (9th Cir. 2007); *Mason ex rel. Marson v. Vasquez*, 5 F.3d 1220, 1225 (9th Cir. 1993) ("[After a prima facie showing, incompetence] is no one's burden to sustain, rather it is for the court to determine by a preponderance of the evidence whether the petitioner is mentally competent to withdraw his petition."). Other federal courts place the burden of proving incompetence by a preponderance of the evidence on the petitioner. *See Wilson v. Lane*, 697 F. Supp. 1500, 1502 (S.D. Ill. 1988); *Groseclose ex rel. Harries v. Dutton*, 594 F. Supp. 949, 953 (M.D. Tenn. 1984). This is in contrast to Tennessee law which places the burden on the post-conviction petitioner to prove incompetence by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2012); *Reid v. State*, 197 S.W.3d at 703-05.

The Davidson County court conducted hearings on May 12 and 13, 2008, to determine Mr. Reid's competency under the *State v. Nix* standard. The Montgomery County court conducted similar hearings on May 14 and 15, 2008. On December 12, 2008, the Davidson County court entered a lengthy order concluding that Mr. Reid had failed to prove that he was incompetent for the purposes of seeking post-conviction relief in the Captain D's and McDonald's cases. As a result of this conclusion, the Davidson County court denied Ms. Martiniano's motion to proceed as Mr. Reed's "next friend" and ordered Mr. Reid to proceed with his original pro se petition for post-conviction relief in the Captain D's case.[41]

Six days later, on December 18, 2008, the Montgomery County court entered a lengthy order concluding that Mr. Reid had failed to prove that he was incompetent for the purpose of seeking post-conviction relief in the Baskin-Robbins case and, therefore, that Ms. Martiniano's motion seeking to pursue post-conviction relief as her brother's "next friend" should be denied. The Court of Criminal Appeals consolidated these two cases on appeal and on August 8, 2011, filed an opinion affirming the judgments of both trial courts. *Reid v. State*, Nos. M2009-00128-CCA-R3-PD, M2009-00360-CCA-R3-PD, & M2009-01557-CCA-R3-PD, 2011 WL 3444171 (Tenn. Crim. App. Aug. 8, 2011).

**III.**

During all the periods of time relevant to seeking post-conviction relief from Mr. Reid's capital convictions, this Court employed two standards for determining competency in a post-conviction proceeding. The choice of the proper standard was dictated by the stage of the proceeding when the issue of competency arose.

The Court first addressed the issue of competency in 2001 in a case that concerned due process tolling of the one-year statute of limitations for post-conviction petitions.[42] After noting that due process requires that prisoners be able to seek post-conviction relief in a meaningful time and in a meaningful manner, we held that the statute of limitations should be tolled during periods when a petitioner is mentally incompetent. *State v. Nix*, 40 S.W.3d at 462.

---

[41] At the subsequent hearing on Mr. Reid's pro se petition, both parties declined to present evidence. Mr. Reid's petition for post-conviction relief was dismissed in an order dated May 24, 2009. This action terminated Mr. Reid's post-conviction appeals, pending review by the Court of Criminal Appeals and this Court.

[42] *See generally* Tenn. Code Ann. § 40-30-102(a) (2012).

-14-

We also determined that post-conviction proceedings were civil proceedings for statute of limitations purposes. Accordingly, we decided that due process would be satisfied by using the "civil competency standard"[43] to determine whether the statute of limitations should be tolled. *State v. Nix*, 40 S.W.3d at 463. We summarized this standard as a two-prong test – a petitioner is mentally incompetent when he or she is "unable either to manage his [or her] personal affairs or to understand his [or her] legal rights and liabilities." *State v. Nix*, 40 S.W.3d at 461, 463. Noting that "mental illness is not the equivalent of mental incompetence," we also concluded that this standard would avoid situations in which "the mere assertion of a psychological problem" could result in a finding of incompetency. *State v. Nix*, 40 S.W.3d at 463.

One year later, in 2002, this Court returned to the question of competency in the context of petitioners facing the death penalty who decide to withdraw their petitions for post-conviction relief. On this occasion, we amended the Tennessee Rules of Post-Conviction Procedure[44] to add a new section dealing with the withdrawal of petitions for post-conviction relief in capital cases.[45] Rather than adopting the "civil competency standard" that we had adopted the year before in *State v. Nix*, we adopted a competency standard that tracked the standard adopted by the United States Supreme Court in *Rees v. Peyton*, 384 U.S. at 314, for the withdrawal of habeas corpus petitions filed in federal court.

Accordingly, Tenn. Sup. Ct. R. 28, § 11(a)(4) requires that the trial court must determine, among other things, that a petitioner "is competent to decide whether to withdraw the post-conviction petition." Tenn. Sup. Ct. R. 28, § 11(B)(1) states:

---

[43]Our "well-established" civil competency standard originated in *Porter v. Porter*, 22 Tenn. (3 Hum.) 586, 589 (1842), in which this Court found a person to be of "unsound mind" when she was "incapable of attending to any business or taking care of herself. . . ." When we recently revisited *Porter v. Porter*, we noted that

> [w]hile the language from *Porter* still serves as a guide in the determination of whether an individual is of unsound mind, the modern test for determining whether an individual is of "unsound mind" for purposes of [Tenn. Code Ann. § 28-1-106] is whether that individual was unable to manage his or her day-to-day affairs at the time the cause of action accrued.

*Sherrill v. Souder*, 325 S.W.3d 584, 600 (Tenn. 2010). In 2011, the Tennessee General Assembly amended the civil tolling statute by replacing the phrase "of unsound mind" with "adjudicated incompetent." Act of Mar. 24, 2011, ch. 47, § 17, 2011 Tenn. Pub. Acts ___, ___ (codified at Tenn. Code Ann. § 28-1-106 (2000 & Supp. 2012)).

[44]*See* Tenn. Sup. Ct. R. 28.

[45]*In Re: Amendment to Supreme Court Rule 28, Sections 11 and 12* (Tenn. Order filed Nov. 21, 2002).

-15-

> The standard for determining competency of a petitioner to withdraw a post-conviction petition and waive further post-conviction relief under this section is: whether the petitioner possesses the present capacity to appreciate the petitioner's position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially affect the petitioner's capacity.

Tenn. Sup. Ct. R. 28, § 11 contains other procedural directives. A petitioner filing a post-conviction petition is "presumed competent to withdraw a post-conviction petition." Tenn. Sup. Ct. R. 28, § 11(B)(2). However, if a "genuine issue" of competency emerges, the trial court must appoint one or two mental health professionals to evaluate the petitioner, and these professionals must file their evaluations with the court. If a "genuine issue" of competency persists after the evaluations are filed, the trial court must conduct a separate hearing. Tenn. Sup. Ct. R. 28, § 11(B)(2)-(3). At the hearing, the petitioner has the burden of proving that he or she is mentally incompetent by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f).

In 2006, we returned to the question of competency in post-conviction proceedings in circumstances in which a prisoner's "next friend" seeks to pursue post-conviction relief on a prisoner's behalf because the prisoner lacks the mental capacity to pursue post-conviction relief. Rather than applying the newly minted competency standard in Tenn. Sup. Ct. R. 28, § 11(B)(1), we decided that the short-hand "civil competency standard" articulated in *State v. Nix* should be used when a prisoner's "next friend" desires to pursue post-conviction relief on the prisoner's behalf. Accordingly, we held that

> the civil standard of mental incompetence adopted in *Nix* applies to the determination of whether a petitioner is competent to proceed in a post-conviction action. A petitioner is, therefore, incompetent to pursue post-conviction proceedings only if he [or she] is unable either to manage his [or her] personal affairs or to understand his [or her] legal rights and liabilities.

*Reid v. State*, 197 S.W.3d at 702.

None of the proceedings occurring after 2002 provided the Court with an occasion to elaborate on the principles or procedures that should be used in the application of the "civil competency standard" recognized in *State v. Nix*. However, in 2003, the Court of Appeals

addressed the civil competency standard in detail in a case in which the court was called upon to decide whether an elderly widow had the capacity, during the relevant time period, "to manage her personal and financial affairs." *In re Conservatorship of Groves*, 109 S.W.3d 317, 327 (Tenn. Ct. App. 2003).

The foundation of the *Groves* court's analysis of the civil competency standard was the "bedrock" principle of autonomy – the right of adults to live their lives consistent with their own personal values. *Groves*, 109 S.W.3d at 327. The court observed that the State may interfere with an adult's autonomy only when his or her ability to be autonomous is partially or totally impaired. *Groves*, 109 S.W.3d at 328-29. The *Groves* court explained:

> A person lacks the ability to be autonomous – to exercise free will – when he or she lacks the ability to absorb information, to understand its implications, to correctly perceive the environment, or to understand the relationship between his or her desires and actions. A person is likewise incapacitated when he or she cannot control his or her actions or behavior. When a person's autonomy becomes impaired, public policy justifies others stepping in to make choices on the person's behalf to promote the person's best interests and to protect the person from harm. However, public policy also favors allowing incapacitated persons to retain as much autonomy as possible and selecting alternatives that restrict incapacitated persons' autonomy as little as possible. Tenn. Code Ann. § 34-1-127 (2001) (requiring that the "least restrictive alternatives" be placed upon a disabled person consistent with adequate protection of the individual's person and property).

*Groves*, 109 S.W.3d at 329.

With regard to the burden of proof, the *Groves* court emphasized that, in light of the importance of autonomy, "it is well-settled that the law presumes that adult persons are sane, rather than insane, and capable, rather than incapable . . . . Mental or physical impairment should never be presumed." *Groves*, 109 S.W.3d at 329-30. Therefore, the party seeking a declaration of incompetency must prove its case by clear and convincing evidence. *Groves*, 109 S.W.3d at 330.

The *Groves* court also expounded on the meaning of capacity:

> Capacity is not an abstract, all-or-nothing proposition. It
> involves a person's actual ability to engage in a particular
> activity. Accordingly, the concept of capacity is task-specific.
> A person may be incapacitated with regard to one task or
> activity while retaining capacity in other areas because the skills
> necessary in one situation may differ from those required in
> another. *Godinez v. Moran,* [509 U.S. 389, 413 (1993)]
> (Blackmun, J., dissenting) (observing that "[a] person who is
> 'competent' to play basketball is not thereby 'competent' to play
> the violin.").

*Groves*, 109 S.W.3d at 333-34. The court further explained that capacity is "situational and contextual." Capacity is not static, and may be affected by many variables that change over time and fluctuate from moment to moment. *Groves*, 109 S.W.3d at 334.

Finally, the *Groves* court noted that capacity encompasses two concepts – functional capacity and decision-making capacity. Functional capacity depends upon decision-making capacity and "relates to a person's ability to take care of oneself and one's property." *Groves*, 109 S.W.3d at 334. This corresponds to the "managing personal affairs" prong of the *State v. Nix* test. On the other hand, decision-making capacity "relates to one's *ability to make and communicate decisions* with regard to caring for oneself and one's property." *Groves*, 109 S.W.3d at 334 (emphasis added). The *Groves* court explained that decision-making capacity involves "a person's ability (1) to take in and understand information, (2) to process the information in accordance with his or her own personal values and goals, (3) to make a decision based on the information, and (4) to communicate the decision." *Groves*, 109 S.W.3d at 335 (footnotes omitted). The court stressed that a person "does not lack decision-making capacity merely because he or she does things that others either do not understand or find disagreeable." The court also noted that "[f]oolish, unconventional, eccentric, or unusual choices do not, by themselves, signal incapacity. However, choices that are based on deranged or delusional reasoning or irrational beliefs may signal decision-making incapacity." *Groves*, 109 S.W.3d at 335-36 (footnotes omitted).

The *Groves* decision counsels that when a court seeks to evaluate a person's decision-making capacity, the court should focus primarily "on the process a person uses to make a decision and only secondarily on the decision itself." *Groves*, 109 S.W.3d at 336. Decision-making capacity hinges on whether a person can "understand pertinent information" and "reason and deliberate about choices particular to a specific decision." *Groves*, 109 S.W.3d at 336. In other words, decision-making capacity is the "mental ability to make a rational decision." *Groves*, 109 S.W.3d at 336 (quoting *State Dep't of Human Servs. v. Northern*, 563 S.W.2d 197, 209 (Tenn. Ct. App. 1978)). The adjective "rational" connotes "a decision

based on a process of reasoning, not necessarily a decision that the prevailing majority would view as acceptable, sensible, or reasonable." The court observed that a person may be "simultaneously capable and incapable with respect to different types of decisions," so "capacity should be determined on a decision-specific basis." *Groves*, 109 S.W.3d at 336. Under the *Groves* decision, then, civil competency depends on the person's capacity for rational decision-making, and this inquiry is context-specific.

This recitation of the civil competency principles in the *Groves* opinion is very germane to this case. In accordance with this Court's 2006 opinion, both the Davidson County court and the Montgomery County court stated that they would employ the civil competency standard adopted in *State v. Nix* to determine whether Ms. Martiniano, as Mr. Reid's "next friend," would be permitted to pursue post-conviction relief on her brother's behalf.[46] However, in addition to *State v. Nix*, both trial courts relied heavily on the principles contained in *In re Conservatorship of Groves* to determine whether Mr. Reid lacked the capacity to make rational decisions with regard to the pursuit of post-conviction relief.

The Court of Criminal Appeals affirmed the trial courts' conclusions that Mr. Reid was competent to pursue post-conviction relief. However, the Court of Criminal Appeals based its analysis regarding Mr. Reid's competency entirely on *State v. Nix* and did not address the trial courts' reliance on *Groves*.[47] By doing so, the Court of Criminal Appeals created an ambiguity with regard to the role that the competency principles in *Groves* should

---

[46]Both trial courts noted the different competency standards in *State v. Nix* and Tenn. Sup. Ct. R. 28, § 11(B)(1). The trial court in Davidson County also observed that

> While it is perplexing that two standards co-exist, the question of whether these two standards can be reconciled or whether they are functionally equivalent is not an issue to be resolved by this Court. . . . [O]ur supreme court is certainly aware of the two standards but chose to adopt the *Nix* standard here. This Court will apply the *Nix* competency standard in its analysis conducted below.

[47]Even though it acknowledged the existence of two competency standards, the Court of Criminal Appeals observed:

> Although the trial courts and Reid may be "perplexed" by the supreme court's adoption of different standards of competence in the post-conviction arena, it is clear to this Court that the standard of competence adopted by the supreme court in *Nix* applies to the ultimate question in the cases at hand. And despite Reid's disagreement with the supreme court's reasoning, we are bound by the decisions of our supreme court.

*Reid v. State*, 2011 WL 3444171, at *28.

-19-

play in proceedings to determine whether a petitioner is competent for the purpose of pursuing post-conviction relief. We will address this ambiguity by determining the standard that courts should use to evaluate competency in a post-conviction proceeding and by determining whether both trial courts in this case properly applied the appropriate standard.

## IV.

We will now turn to the evidence contained in these records regarding Mr. Reid's competency to pursue post-conviction relief and the trial courts' decisions regarding Mr. Reid's competency. This evidence was introduced in three hearings: (1) a hearing conducted in 2007 by the Criminal Court for Davidson County in which the trial court employed the standard found in Tenn. Sup. Ct. R. 28, § 11(B) to determine whether Mr. Reid was competent to withdraw his post-conviction petition in the Captain D's case,[48] (2) a hearing conducted in 2008 by the Criminal Court for Davidson County to determine whether Ms. Martiniano and the Office of the Post-Conviction Defender could pursue post-conviction relief on Mr. Reid's behalf in the Captain D's and McDonald's cases, and (3) a hearing conducted in 2008 by the Circuit Court for Montgomery County to address whether Ms. Martiniano and the Office of the Post-Conviction Defender could pursue post-conviction relief on Mr. Reid's behalf in the Baskin-Robbins case.

## A.

Mr. Reid's competence is at issue because he appears to suffer from several significant delusions. All of the witnesses and parties acknowledge the following facts.

According to Mr. Reid, a government intelligence agency that he calls "Scientific Technology" has been monitoring and recording all of his activities since 1985. Mr. Reid has stated that Scientific Technology possesses video recordings that could exonerate him of the murders.

Mr. Reid has also stated that Scientific Technology has the ability to affect him both mentally and physically. According to Mr. Reid, Scientific Technology attempts to influence him in subtle ways, such as by causing him to forget things and to experience strange tastes

---

[48]The evidence introduced at the 2007 hearing is relevant because we have now determined that the competency standard in Tenn. Sup. Ct. R. 28, § 11(B) is functionally equivalent to the *State v. Nix* standard when applied using the principles in *In re Conservatorship of Groves*. A conflict between the 2007 decision and the 2008 decisions could require a remand. However, we have determined that no conflict exists because the Davidson County court did not find that Mr. Reid was incompetent based on the evidence introduced at the 2007 hearing.

and smells. He also states that Scientific Technology afflicts him with itching sensations. After his trials, Mr. Reid developed the belief that Scientific Technology controlled his legal proceedings and "coached" the attorneys, judges, and witnesses. Mr. Reid claims to believe that his trials were mock trials, and that his attorneys are actors, hired by Scientific Technology to participate in an elaborate experiment in which Mr. Reid is the test subject.

Mr. Reid also claims to have discovered that he was not actually sentenced to death. Instead, Mr. Reid says that he has lawyers in Washington, D.C., who negotiated for him a ten- to twelve-year sentence, to be served at eighty percent. Understandably, Mr. Reid's position has made it difficult for his attorneys to solicit his cooperation during his post-conviction litigation.

Additionally, Mr. Reid claims to be engaged to a woman named Susan whom he met while a student at Volunteer State Community College. Mr. Reid has said that he has executed a will naming Susan as the beneficiary and that he mailed the will to a judge serving on the United States District Court in Nashville. Although none of the witnesses in this case appear to have investigated whether Susan is a real person whose identity Mr. Reid is protecting, they assume she is a figment of Mr. Reid's imagination.

The parties and witnesses also generally agree that Mr. Reid has stated other, more mainstream, reasons for desiring to terminate his post-conviction appeals. He has said that he does not want a new trial because he does not want to hear people take the stand and say awful things about him again. He has also said that a new trial would be futile because three juries have already convicted him and a new trial would likely produce the same result. On the other hand, Mr. Reid has also said that he wishes to be executed because death is the only thing that would free him from the grasp of Scientific Technology. At other times, Mr. Reid maintains that he expects to be set free, to marry Susan, and to be given large sums of money.

The parties and witnesses also agree that Mr. Reid suffers from physical brain damage, although they differ over the extent to which this organic infirmity affects his cognition. On May 1, 1998, Dr. Robert Kessler, a neuro-radiologist at Vanderbilt University, performed Magnetic Resonance Imaging (MRI) and Position Emission Tomography (PET) scans on Mr. Reid. Dr. Kessler conducted another MRI scan of Mr. Reid on August 18, 2006. These scans revealed that Mr. Reid has a lesion, or atrophied area, on the anterior part of the left temporal lobe of his brain. This condition may have been partially congenital (Mr. Reid was born with a deformity in his left ear that rendered him deaf), but the expert witnesses agree that the brain lesion was either caused or exacerbated by head injuries. For example, when Mr. Reid was five or six years old, another child hit him in the head with a brick. At age 13, Mr. Reid suffered an accident on a minibike which fractured his skull and put him in the hospital for a week.

The left temporal lobe is known as the language center of the brain, and indeed Mr. Reid's speech patterns are strikingly unusual. Mr. Reid apparently tries to compensate for his lexical handicaps by memorizing esoteric vocabulary words that he often uses or pronounces incorrectly.[49] The experts disagree whether Mr. Reid's brain injury is the likely cause of his delusions or his déjà vu-like claims that the same events keep happening to him again and again.

**B.**

In 2007, the Davidson County court held a competency hearing under Tenn. Sup. Ct. R. 28, § 11(B). The issue was whether Mr. Reid was competent to withdraw the petition for post-conviction relief that he filed just before his scheduled execution in April 2003. Following a preliminary hearing on December 1, 2006 pursuant to Tenn. Sup. Ct. R. 28 § 11(B)(3), the post-conviction court found that a "genuine issue" existed regarding Mr. Reid's competency. Pursuant to Tenn. Sup. Ct. R. 28 § 11(B)(2), the court appointed two mental health professionals, Dr. George Woods and Dr. William Bernet, to evaluate Mr. Reid.[50]

Dr. Woods is a forensic psychiatrist based in California. He first examined Mr. Reid in June 2006, and he evaluated him again in December 2007 under both the Tenn. Sup. Ct. R. 28, § 11(B) and *State v. Nix* competency standards. Dr. Woods diagnosed Mr. Reid as suffering from psychosis with paranoid delusions that were symptomatic of his brain damage, plus an unspecified cognitive disorder. He also concluded that Mr. Reid was incompetent under both standards.

Dr. Bernet is a forensic psychiatrist and full-time faculty member at Vanderbilt University. He directs Vanderbilt's Forensic Services program. Dr. Bernet first evaluated Mr. Reid prior to Mr. Reid's pre-trial competency hearing in the Baskin-Robbins case in January and February 1999. At that time, Dr. Bernet diagnosed Mr. Reid with antisocial personality disorder, delusional paranoia, and "a tendency to malinger." He nevertheless considered Mr. Reid competent to stand trial. Dr. Bernet also testified as the State's rebuttal witness at the penalty phase of the Baskin-Robbins trial, and reiterated his belief that Mr. Reid was exaggerating his psychotic symptoms. *State v. Reid*, 164 S.W.3d at 303, 305.

---

[49]Mr. Reid keeps a heavily underlined dictionary in his cell.

[50]Dr. Woods, along with Dr. Xavier Amador, was recommended by Mr. Reid's counsel. Dr. Bernet was not recommended by either party. However, the trial court selected him because of his prior interactions with Mr. Reid.

The trial court conducted three days of hearings in July and September 2007. In addition to the testimony of Drs. Woods and Bernet, the court heard the testimony of several Department of Correction employees. Mr. Reid's counsel also submitted a series of "expert notebooks" containing compilations of prior reports and testimony from mental health professionals introduced in earlier proceedings.

Dr. Bernet testified first, and focused on the history of Mr. Reid's mental health issues. He noted that twelve mental health professionals had found Mr. Reid to be actively psychotic, while sixteen had concluded that Mr. Reid was not psychotic at all. While Dr. Bernet had initially diagnosed Mr. Reid as delusional, he had changed his diagnosis by the time of this hearing. Dr. Bernet testified that, when he examined Mr. Reid in 1999, Mr. Reid told him that he had made up all of the delusions but that he had repeated the lies so many times he was having difficulty separating fantasy from reality. He also told Dr. Bernet that his initial motivation for faking psychosis was to avoid prosecution in Texas.

Mr. Reid also explained to Dr. Bernet that in 1978 a defense attorney had tutored him on how to fake mental illness and that two Texas juries had subsequently found him to be incompetent. Mr. Reid told Dr. Bernet that after he pleaded guilty to a robbery in Texas in 1984, he continued spreading his government surveillance stories (including sending letters to public officials) to draw attention to himself in hopes of getting that conviction overturned. During Dr. Bernet's February 2007 examination,[51] Mr. Reid told him that the delusions of government surveillance were now real. Dr. Bernet believed, however, that Mr. Reid was still essentially faking it. Dr. Bernet suggested that Mr. Reid's mental issues always arose in conjunction with his legal troubles and disappeared whenever he was released from prison.

After testifying that Mr. Reid had a long list of coherent reasons why he wanted to withdraw his petition, Dr. Bernet concluded that Mr. Reid was competent under the Tenn. Sup. Ct. R. 28, § 11 standard. He diagnosed Mr. Reid as suffering from depression, antisocial personality disorder, and a language disorder related to his temporal lobe injury. He additionally described Mr. Reid as engaging in what he called "pseudologia fantastica," which is a technical term for pathological lying.[52] Dr. Bernet also stated that he believed Mr. Reid lied to others and to himself as a defense mechanism to avoid the harsh truth that he murdered seven people. He also opined that significant aspects of Mr. Reid's behavior were

[51]The transcripts and video recordings of Dr. Bernet's interviews with Mr. Reid on February 13 and 27, 2007, are part of the record, as are Dr. Bernet's interview with Mr. Reid on April 11, 2008, and Dr. Martell's interview with Mr. Reid on April 22, 2008.

[52]Dr. Bernet stressed that pseudologia fantastica is not a clinical diagnosis under the American Psychiatric Ass'n, *Diagnostic and Statistical Manual on Mental Disorders* xxxiii (4th ed. text rev. 2000) ("DSM-IV-TR"), but rather is a well-known symptom or pattern of behavior that differs from malingering.

inconsistent with delusional disorder. For example, unlike most individuals who believe they are victims of government surveillance, Mr. Reid had not attempted to locate the hidden surveillance devices.

Dr. Bernet concluded that "either Mr. Reid is a non-psychotic but prevaricating individual who sometimes pretends to be delusional or he is a severely psychotic, delusional man who sometimes pretends to be totally free of delusions." Dr. Bernet testified that he believed Mr. Reid to be the former. He also noted that if Mr. Reid was truly delusional and out of touch with reality, he was unlikely to be mentally competent. If Mr. Reid was lying, though, he would be competent.

Dr. Woods testified after Dr. Bernet and supported his testimony with a PowerPoint™ presentation. Dr. Woods emphatically disagreed with Dr. Bernet's conclusion that Mr. Reid was malingering. He believed Mr. Reid suffered from psychosis and cognitive disorders related to his left temporal lobe damage and that his mental health was inexorably deteriorating. He testified that Mr. Reid's delusions prevented him from cooperating with his attorneys whom he believed to be actors controlled by Scientific Technology. According to Dr. Woods, Mr. Reid filtered everything through a lens of paranoid irrationality, and this psychosis completely undermined Mr. Reid's ability to make rational decisions.

A series of Department of Correction employees, including mental health professionals, then testified that Mr. Reid rarely, if ever, spoke of Scientific Technology in their presence. One of them testified about prescribing the antidepressant Elavil to Mr. Reid and added that she would not have done so if she believed him to be delusional. Drs. Bernet and Woods were both recalled to the stand and reiterated their previous conclusions.

The trial court filed its order on December 20, 2007. The court's procedural discussion is noteworthy for two reasons. First, the court observed that "Rule 28, Section 11 fails to mention who has the burden of proving competency and to what degree." However, the court decided that it was "unnecessary to reach that issue" but suggested that "the burden of proof issue should be resolved by our appellate courts." Second, the trial court decided to use *Rumbaugh v. Procunier*, 753 F.2d 395 (5th Cir. 1985),[53] as a framework for interpreting and applying Tenn. Sup. Ct. R. 28, § 11. In *Rumbaugh v. Procunier*, the United

_____

[53]The trial court found it significant that the Court of Criminal Appeals has relied on *Rumbaugh v. Procunier* in decisions involving the *Rees v. Peyton* standard. *Pike v. State*, No. E2002-00766-CCA-R3-PD, 2004 WL 1580503, at *16-17 (Tenn. Crim. App. July 15, 2004). *Cf. Pike v. State*, 164 S.W.3d 257, 265 (Tenn. 2005) (citing this portion of *Rumbaugh v. Procunier* with approval); *Hugueley v. State*, No. W2009-00271-CCA-R3-PD, 2011 WL 2361824, at *37 (Tenn. Crim. App. June 8, 2011), *perm. app. denied* (Tenn. Dec. 13, 2011) (citing *Rumbaugh v. Procunier* while discussing Tenn. Sup. Ct. R. 28, § 11).

States Court of Appeals for the Fifth Circuit stated that the *Rees v. Peyton* test requires answering the following three questions:

> (1) Is the person suffering from a mental disease or defect?
>
> (2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?
>
> (3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?
>
> If the answer to the first question is no[;] the court need go no further, the person is competent. If both the first and second questions are answered in the affirmative, the person is incompetent and the third question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative; if yes, the person is incompetent, if no, the person is competent.

*Rumbaugh v. Procunier*, 753 F.2d at 398-99. The trial court's analysis in its December 2007 order is structured according to this three-part inquiry. We agree with the trial court that the *Rumbaugh* framework is a useful tool for conducting a competency analysis under Tenn. Sup. Ct. R. 28, § 11.

In response to the first *Rumbaugh* question, the trial court found that Mr. Reid suffered from a mental disease or defect, namely his temporal lobe injury. In response to the second *Rumbaugh* question, the trial court found that Mr. Reid understood his legal

position.[54]  Thus, the trial court believed that the answer to the third *Rumbaugh* question was dispositive, despite the fact that it presented a "difficult . . . conundrum."

The court found itself at the decisional crossroads articulated by Dr. Bernet – either Mr. Reid was a non-psychotic person trying to appear psychotic, or he was a psychotic person working hard at times to appear sane.  The court observed that "[c]redible evidence exists in the record to support either position."  It noted that Mr. Reid had a long history of delusional claims but that he also had a history of questionable truthfulness relating to those claims.  The court also noted that, presuming that Mr. Reid's delusions were completely fabricated, the court would still be faced with whether those pathological lies affected Mr. Reid's ability to make rational choices.

The trial court finally settled on "three possible scenarios:"

> (1) The delusional system is false because [Mr. Reid] is a pathological liar and the lying has no effect on his ability to make rational choices among his options; (2) [Mr. Reid's] delusions are real due to a delusional disorder and he is therefore unable to make rational choices among his options; or (3) the delusional system is false because [Mr. Reid] is a pathological liar but the lies have become so ingrained that he is now unable to remove himself from the lies and therefore cannot make rational choices among his options.

At this point, the trial court's analysis became remarkably subtle.  Ultimately, the court refused to allow Mr. Reid to withdraw his petition but stopped short of actually finding him incompetent.[55]  While "[t]he evidence before the court might arguably support one scenario

---

[54]Recounting its own examination of Mr. Reid at the December 1, 2006 preliminary hearing, the trial court found that Mr. Reid had a clear understanding of his three homicide cases and the consequences of withdrawing his petition.  After noting that "[a]lmost every expert agrees" that Mr. Reid's mental status had diminished since his first murder trial, the trial court determined that Dr. Bernet's assessment of the issue was more credible than Dr. Woods's assessment.  The court found Dr. Woods's position that Mr. Reid "had absolutely no understanding of his position" and that Mr. Reid's "intelligent responses" to questions were the product of mental disease to be "disingenuous."  The court also found Dr. Woods's arguments to be "circular," and declared that his testimony was "not credible on this point."

[55]We cannot agree with the Court of Criminal Appeals' statement that the Davidson County court "concluded" in its December 20, 2007 order "that Reid was not competent to withdraw his petition." *Reid v. State*, 2011 WL 3444171, at *3.

over another," the court found the choice between the three scenarios was "simply too close to call."

The court decided that two factors "tip the proverbial scale in favor of protecting the petitioner's rights." The first factor was that Mr. Reid was facing the death penalty, which entitled him to heightened scrutiny and obviated against simply flipping a coin to decide which scenario the court would adopt. The second factor that the trial court believed was "significant" was the State's concession in the pending federal habeas corpus proceedings that Mr. Reid was not competent under the *Rees v. Peyton* standard. Based on these considerations, the trial court decided that "[i]n such a close case with a constant ebb and flow in mental status," it would be "problematic" and "unreasonable to permit a defendant to terminate an entire tier of review of his capital case." Accordingly, the trial court stated that "[f]undamental fairness" dictated that Mr. Reid's request to withdraw his post-conviction petition be denied.

The Davidson County court's 2007 order included a significant caveat. The court noted that the *State v. Nix* standard would apply in the upcoming 2008 hearing and that this standard invoked other "considerations" that were "not before the court at this time." Accordingly, the court observed that "the result might be different" under a different competency standard.

## C.

On May 12 and 13, 2008, the Davidson County court conducted a hearing to determine Mr. Reid's competency under the *State v. Nix* standard. The Captain D's and McDonald's cases were consolidated for this hearing, but the court released separate orders in light of the cases' differing procedural postures. The question presented in the Captain D's case was whether Ms. Martiniano should be permitted to assume control of Mr. Reid's post-conviction appeals due to Mr. Reid's present incompetence to proceed on his own petition that he filed in 2003. The McDonald's case focused on whether Mr. Reid was competent during the one-year statute of limitations period from December 27, 2006 to December 26, 2007. If he was not competent during this period, then the statute of limitations would be tolled, and Ms. Martiniano could proceed on her "next friend" petition in that case.

The court heard testimony from Drs. Woods, Bernet, and Martell. All the exhibits from the 2007 Tenn. Sup. Ct. R. 28 hearing were entered into the record. Dr. Woods had examined Mr. Reid following the 2007 hearing. He opined that Mr. Reid remained delusional and afflicted with "fixed false beliefs that were unshakable," and that his psychotic state was deteriorating. Dr. Woods testified that Mr. Reid "sees the truth as the

delusions" and "the delusions as the accurate reflection of life." He noted, for example, that Mr. Reid states that his real trials and death sentence are fake, while his imaginary lawyers and determinate sentence are real. Dr. Woods also testified that although Mr. Reid may appear to give intelligent answers to legal questions, he is really only "parroting" what he has been told without truly understanding it. In other words, Dr. Woods said that Mr. Reid's cognition is shellacked with a "veneer," "patina," or "polish" of understanding that barely conceals the festering delusions underneath.

Dr. Woods testified that under the *State v. Nix* standard, Mr. Reid was unable to understand his legal rights and responsibilities, and that he was unable to manage his personal affairs. He maintained that Mr. Reid's personal affairs included his legal affairs, and that Mr. Reid's delusions about Scientific Technology affected both his daily activities and his ability to oversee his post-conviction litigation. Dr. Woods also noted that, unlike Drs. Bernet and Martell, he did not record his interviews because the American Psychological Association had expressed concerns about how it might alter the clinical relationship.[56] While he acknowledged that Mr. Reid had lived normally before his arrest, Dr. Woods opined that this was typical of people who suffer delusional disorders – while they appear normal at first, they gradually descend deeper and deeper into madness.

Dr. Bernet testified after Dr. Woods. He too had examined Mr. Reid following the 2007 hearing.[57] In addition to his own examinations, Dr. Bernet had read approximately thirty evaluations of Mr. Reid by other mental health professionals and had also recently interviewed prison officials. The Department of Correction employees told Dr. Bernet that Mr. Reid did not appear to have serious psychiatric problems, and that he had not mentioned government surveillance in their presence for years.

Dr. Bernet testified that Mr. Reid's condition had not changed noticeably since his 2007 examination. He disagreed with Dr. Woods's assessment that Mr. Reid was getting worse. Dr. Bernet noted that Mr. Reid was able to recall numerous details about his past hearings, as well as Dr. Bernet's last interview with him. As before, Mr. Reid provided Dr. Bernet with numerous reasons for not wanting a new trial, none of which involved Scientific Technology. Dr. Bernet focused on one "eloquent" statement in particular, in which Mr. Reid said that he wanted to make the decision to pursue a new trial, one of the most important decisions in his life, himself. Mr. Reid said:

---

[56]Dr. Martell, however, testified that it had always been his practice to tape interviews, and that he could think of no professional organization that prohibited or discouraged the taping of interviews.

[57]By this time, Dr. Bernet had interviewed Mr. Reid on six occasions for a total of 13.7 hours.

People come here to badger me and what have you, to get me to
. . . change my opinion. I try to be most . . . decent and
respectful to people and hold steadfast that I'm entitled to my
vote, to my opinion, that when I step[] into the voting booth, that
I won't be disenfranchised, I won't be manipulated, that I have
the democratic right to cast my vote as I see fitting. . . . We had
a trial. I don't appreciate the outcome of the trial, but I live with
the results.

Dr. Bernet testified that Mr. Reid talked about Scientific Technology during the interview, but stated that this topic arose whenever he asked Mr. Reid to think about his crimes. According to Dr. Bernet, Mr. Reid typically only talks about Scientific Technology when his audience appears interested in it. For example, Dr. Bernet noted in his report that Mr. Reid talks at length to his lawyers about Scientific Technology but rarely, if ever, shares these ideas with psychiatrists at Riverbend Prison. Although he characterized Mr. Reid's symptoms as "fantasies" or "lies," Dr. Bernet admitted that Mr. Reid has not claimed his delusions were fabricated since 2003.

Dr. Bernet opined that Mr. Reid was narcissistic, with a high opinion of himself and a deep concern for what other people think about him. He testified that the Scientific Technology fantasy is designed to reassure both Mr. Reid and others that he could not have possibly committed the murders. Dr. Bernet theorized that, in the same way Mr. Reid's fantasies about government surveillance protect him from acknowledging the horrible things he has done in the past, Mr. Reid's fantasies about his imaginary fiancée reinterpret his future. Like his past, Mr. Reid's future is dark because he actually will either die in prison or be executed. Both fantasies, then, shield Mr. Reid from harsh truths.

Dr. Bernet concluded that Mr. Reid's delusions were not genuine delusions. He noted that Mr. Reid has "had thirty years experience in fabricating psychiatric symptoms." Dr. Bernet testified that Mr. Reid has "gotten better and better at it. . . . It's kind of a game with him." Dr. Bernet also noted a recent study that found only five percent of people with traumatic brain injury experience delusions and that those who do tend to have much more severe injuries than Mr. Reid. Accordingly, Dr. Bernet testified that Mr. Reid was competent under the *State v. Nix* standard and that his fantasy defense mechanisms did not compromise his ability to manage his affairs or understand his legal rights and liabilities.

Dr. Daniel Martell also testified at the 2008 hearing in Davidson County. He is a forensic neuropsychologist who was retained by the State to assess Mr. Reid in conjunction with the Captain D's trial in January 1999. At the sentencing phase of that trial, Dr. Martell testified that he had diagnosed Mr. Reid as suffering from a mild neurocognitive disorder,

antisocial personality disorder, and a delusional disorder (in substantial remission) with grandiose and persecutory features. Dr. Martell also testified that these disorders had not substantially impaired Mr. Reid's judgment or his capacity to conform his conduct to the law or to know right from wrong. *State v. Reid*, 91 S.W.3d at 270-71. In addition, Dr. Martell had testified at the McDonald's trial and had concluded that Mr. Reid was not suffering from delusions at that time. He had also suggested that Mr. Reid had been exaggerating his symptoms for the purpose of an insanity defense. *State v. Reid*, 213 S.W.3d at 809-10. Dr. Martell examined Mr. Reid again in August 2006 and April 2008. It was Dr. Martell's 2006 evaluation that led the Attorney General's Office to concede Mr. Reid's incompetency in federal court.

At the 2008 competency hearing, Dr. Martell testified that while Mr. Reid appeared "acutely disturbed" in 2006, his symptoms were diminished but still active in 2008. Dr. Martell continued to believe that Mr. Reid experienced some genuine delusions. However, he also testified that during his most recent interview with Mr. Reid, he had conducted tests indicating that Mr. Reid was malingering or exaggerating his symptoms. According to Dr. Martell, this made it difficult to determine which symptoms were genuine and which were exaggerations. Despite the psychotic symptoms, Dr. Martell concluded that Mr. Reid was able to manage his personal affairs.

Dr. Martell had difficulty reaching a conclusion under the "legal rights and liabilities" prong of the *State v. Nix* standard because he considered it vague. He believed that Mr. Reid had been competent to stand trial and that he was presently competent (for purposes of the Captain D's case). However, Dr. Martell hesitated to state that Mr. Reid was competent during the period from December 2006 to December 2007 (for purposes of the McDonald's case). He testified that Mr. Reid's delusional disorder would wax and wane, as though Mr. Reid kept his delusions in a suitcase. According to Dr. Martell, the suitcase was open in 2006, and the delusions were running wild. However, in 2008, the delusions were more "encapsulated." Dr. Martell opined that stress could be what exacerbates Mr. Reid's symptoms.

Dr. Martell testified that he respected Dr. Bernet's opinion. However, he noted that he found it difficult to decide whether Mr. Reid's delusions undermined his competency. Dr. Martell noted that some new symptoms had sprung from the smithy of Mr. Reid's psyche, including Mr. Reid's theory that he was serving a determinate sentence. At the time of the 2008 interview, Mr. Reid's imaginary ten- to twelve-year sentence had already expired. Mr. Reid told Dr. Martell that he remained in prison because he had refused to accept an apology from Scientific Technology. Mr. Reid also told Dr. Martell that Scientific Technology had caused him to experience strange smells and tastes, as well as a painful rectal itch. Nevertheless, although Dr. Martell had found Mr. Reid to be incompetent under the *Rees v.*

*Peyton* standard for purposes of the federal habeas corpus proceedings in 2006, he concluded that Mr. Reid was presently competent for the Captain D's case and competent during the statutory limitations period for the McDonald's case.

On December 12, 2008, the Davidson County court filed two lengthy and detailed orders in the Captain D's and McDonald's cases. While these orders were substantively identical, they differed with regard to the procedural posture of each of the cases. At the outset, the court restated the holding in its 2007 order that "[this] court concluded, without specifically finding that [Mr. Reid] was incompetent, that a combination of factors, including the evidence presented, the waxing and waning nature of [Mr. Reid's mental] condition and fundamental fairness concerns, warranted a finding that [Mr. Reid] not be permitted to withdraw his petition."[58] The court also reviewed, in depth, the testimony and findings from the 2007 hearing and the 2008 hearing.

To aid its analysis, the Davidson County court turned to *In re Conservatorship of Groves*. The court noted that

> Tennessee case law interpreting the *Nix* civil competency standard is scant. However, a reported decision from the Tennessee Court of Appeals provides a thorough and informative analysis of the civil competency standard.
>
> [*Groves*] . . . examined in detail each prong of the civil competency standard (as adopted in *Nix*). Although the *Groves* case examines competency in the context of a conservatorship proceeding, the analysis of the competency standard is equally applicable here.

The court then devoted approximately five pages to the same competency principles articulated in *Groves*, which we have already summarized in Section III.

---

[58]In its May 27, 2009 order dismissing Mr. Reid's *pro se* petition, the same court repeated this characterization of its 2007 order:

> Following a Rule 28 competency hearing, the Court held that while [Mr. Reid's] competency waxed and waned during this time, it *stopped short of finding [Mr. Reid] incompetent* under the *Rees v. Peyton* standard. Nonetheless, the Court concluded that fundamental fairness (in light of certain concessions by the Attorney General's Office) dictated that [Mr. Reid's] request to withdraw his *pro se* petition be denied. (emphasis added).

The Davidson County court looked to *Groves* as its lodestar for analyzing Mr. Reid's competency. The court began its discussion by stating that the "considerations set out in *Groves*" provide "a useful starting point." The court then considered whether Mr. Reid was able to manage his personal affairs under the *Groves* rubrics of "functional capacity" and "decision-making capacity."

The court focused on Mr. Reid's videotaped interviews with Drs. Martell and Bernet.[59] According to the court, these interviews reflected that Mr. Reid had a "rational understanding of his personal affairs" and applied a "rational decision-making process in making his choices." The court found that Mr. Reid's descriptions of the choices he made throughout the day, and his reasons underlying those choices, reveal that his functional and decision-making capacities remain intact.[60] The trial court found that these choices "illustrate [Mr. Reid's] understanding of his personal affairs." Even though Mr. Reid had limited choices available to him as a prisoner, the court concluded that he had "a remarkable understanding of his daily choices and the reasons behind the choices he makes." Accordingly, the court found that Mr. Reid was "not incompetent under *Nix* to manage his personal affairs."

The trial court then turned to the "legal rights and liabilities" prong of the *State v. Nix* standard. "Again," the court noted, "*Groves* provides a helpful framework for conducting this analysis." The court determined that it "must examine closely whether [Mr. Reid] had the decision-making capacity described in *Groves*, including the injection of the adjective 'rational' to describe the quality and character of the decisions being made." The court then quoted *Groves* for the proposition that "[d]ecision-making capacity involves a person's

[59]As in its 2007 order, the Davidson County court continued to take a dim view of Dr. Woods's credibility. The court found that

> Dr. Woods'[s] broad brush is disingenuous under the first *Nix* prong; therefore, the Court finds his testimony not to be credible on this specific issue. Rather than giving a concession when a response by [Mr. Reid] was genuine, Dr. Woods explains away objectively reasonable testimony as being rendered at the hand of Scientific Technology. The record does not bear out such a conclusion.

[60]The trial court specifically noted Mr. Reid's choices (1) to rise early every morning, (2) to use his recreation time for exercise, (3) to refrain from joining in the usual recreation yard conversations because he finds them unedifying, (4) to select the television programs he desires to watch, (5) to select the type of food he eats, and (6) to select the items he buys at the prison commissary. The trial court also noted that Mr. Reid manages his commissary account, corresponds with persons outside of prison, and keeps a journal and that Mr. Reid has even prepared a will (although this will contained a delusional element if the beneficiary of the will is not a real person).

ability (1) to take in and understand information, (2) to process the information in accordance with his or her own values and goals, (3) to make a decision based on the information, and (4) to communicate the decision." Even though the court noted that this analysis was "difficult" in light of the divergent expert opinions concerning Mr. Reid's ability to make rational decisions about his post-conviction matters, the court found Mr. Reid to be competent "in light of the autonomy recognized by [*Groves*] and the clear and convincing evidence standard enumerated in [*Reid v. State*, 197 S.W.3d at 703-05]."

The trial court then recounted portions of the relevant expert testimony and recalled Mr. Reid's own testimony in the 2007 hearing. The court found that Mr. Reid "had a remarkable grasp of his three complex capital cases." The court believed that Mr. Reid's responses to the court's questions reflected "a rational understanding of his legal position." The trial court also found that Mr. Reid had an "understanding of two relevant and valid post-conviction issues," namely that his trial counsel was arguably deficient in failing to challenge the shoe prints found at the crime scene and a cache of coins seized from Mr. Reid's home.

Ultimately, the trial court was faced with a dilemma similar to the one it faced in the 2007 proceedings, arising from the differing expert opinions. Dr. Woods testified that Mr. Reid was too deeply delusional to understand his legal rights and liabilities. Dr. Martell testified that Mr. Reid was delusional, but that his delusions did not impair his basic understanding of his legal rights and liabilities. Dr. Bernet testified that Mr. Reid was a habitual liar, and that even if Mr. Reid now believes his lies are the truth, he nonetheless can understand his legal rights and liabilities. After observing that "there is evidence to support all three positions," the court resolved the "perplexing" dilemma by focusing on the clear and convincing evidence burden of proof. The court stated that

> [T]he interplay between [Mr. Reid's] understanding and the effects, if any, of the delusions or thoughts or fantasies about [S]cientific [T]echnology on his understanding when inserting the descriptive term "rational" creates what this Court believes to be the seminal issue – does [Mr. Reid] have a rational understanding (in light of the delusions or fabricated stories that perhaps have become the "truth" to [Mr. Reid]) of his legal rights and liabilities?

The trial court could not eliminate any "serious or substantial doubt concerning the correctness of the conclusion of [Mr. Reid's] incompetence." Finding "substantial credible evidence," the court held Mr. Reid was competent. The court thus had "substantial doubt" that he was incompetent under *State v. Nix.* The court noted that "the result could be

-33-

different under a different competency standard or a different burden of proof." Nevertheless, the court found that Ms. Martiniano had not borne her evidentiary burden. The court dismissed her "next friend" petition in both cases, and ordered that Mr. Reid would proceed on his original post-conviction petition in the Captain D's case.[61]

Two almost paradoxical observations are crucial for our purposes. First, the Davidson County court clearly differentiated the Tenn. Sup. Ct. R. 28, § 11 standard and the *State v. Nix* standard. By doing this, the court was simply following our lead. *See Reid v. State*, 197 S.W.3d at 696, 701-06; *Holton v. State*, 201 S.W.3d at 634-35. Second, however, it is also clear that the court applied the *State v. Nix* standard in light of *In re Conservatorship of Groves* and explicitly focused its attention on whether Mr. Reid could make "rational" procedural decisions. Thus, the trial court applied *State v. Nix* in a way that made it functionally equivalent to the standard in Tenn. Sup. Ct. R. 28, § 11. Although the trial court refrained from making a specific finding of rationality in 2007, it explicitly found in 2008, under a nearly identical standard, that Mr. Reid's sister and the Office of the Post-Conviction Defender had failed to prove by clear and convincing evidence that Mr. Reid lacked the ability to make rational decisions regarding the management of his post-conviction petitions.

**D.**

On May 14 and 15, 2008, the Montgomery County court conducted a hearing to determine Mr. Reid's competency with regard to the post-conviction proceedings in the Baskin-Robbins case. In a detailed order filed on December 18, 2008, the court reached the same result that the Davidson County court had reached in the McDonald's case. It found that Mr. Reid was not entitled to due process tolling of the statute of limitations because he was competent to pursue post-conviction relief under the *State v. Nix* standard during the one-year period following the affirmance of his conviction and sentence on direct appeal.

During this hearing, the Montgomery County court received the testimony of Drs. Woods, Martell, and Bernet. In addition, Connie Westfall, a former investigator for the Office of the Post-Conviction Defender, and Dr. Michael First testified. The trial court's order summarized the testimony of each witness. The court noted that none of the experts had examined Mr. Reid during the relevant time period to assess his competency under the *State v. Nix* standard, but that Dr. Woods had interviewed him during that period for other purposes.

---

[61]As we previously noted, at the subsequent hearing on this *pro se* petition, both parties declined to present evidence. Mr. Reid's petition for post-conviction relief was dismissed in an order dated May 24, 2009. This terminated Mr. Reid's post-conviction appeals, pending review by the Court of Criminal Appeals and this Court.

Testifying first, Dr. Woods opined that Mr. Reid suffered from a genuine delusional break from reality and was not malingering or fantasizing. Dr. Woods testified that he believed that Mr. Reid's delusions relate to control, i.e. that his physical, emotional, and intellectual functioning is monitored and orchestrated by Scientific Technology, and that these delusions affected Mr. Reid's understanding of his legal affairs and rendered him incompetent under both prongs of *State v. Nix*. Dr. Woods conceded that Mr. Reid had previously held jobs, had been able to live on his own, had been married, had purchased a car on credit, had earned his GED, and had taken classes at Volunteer State Community College. He also agreed that Mr. Reid emphasized his delusions at some times more than others, and that Mr. Reid had told other mental health professionals that his delusions were fabricated. However, Dr. Woods did not agree that Mr. Reid's delusional behavior waxed and waned in synchronicity with his legal troubles. Dr. Woods testified that Mr. Reid has "consistently" not wanted to be found incompetent or mentally ill.

Ms. Westfall testified next. She stated that she regularly visited Mr. Reid from May 2003 to December 2007, sometimes as often as every two weeks. She also testified that she kept records of Mr. Reid's physical, mental, and emotional condition. Ms. Westfall testified that, during the relevant time period, no one from Mr. Reid's legal team was able to conduct a meaningful and rational conversation with him about his case. Nor were they able to get Mr. Reid to set aside his beliefs about Scientific Technology. Ms. Westfall's conclusion, as a layperson, was that Mr. Reid had "descended completely into his delusion." Ms. Westfall also testified that the rational reasons Mr. Reid articulated for foregoing a new trial were "secondary" to his reasons that were based on Scientific Technology.

Dr. Martell's testimony tracked the testimony he had given days before in the Davidson County proceedings. He stated that the lid to Mr. Reid's "Pandora's box" of delusions had been opened between 1999 and 2006, and that Mr. Reid's delusions were, at that point, no longer "encapsulated." However, according to Dr. Martell, Mr. Reid has an "elaborate history" of feigning symptoms and malingering. Thus, Dr. Martell opined that Mr. Reid's lying was probably a symptom of his antisocial personality disorder. According to Dr. Martell, Mr. Reid was like "the boy who cried wolf," and his case was a "diagnostic nightmare." Nevertheless, even in 2006, Dr. Martell had noted that Mr. Reid was able to appreciate his legal position:

> He's always, over the times I've seen him, had an eloquent and rich understanding of the charges against him, of what's going on with his cases; his delusions have never interfered with his capacity to understand the processes or the charges. [It has] interfered with some of his thinking about evidence he might put

into play, for example [videotapes of his life that were recorded by Scientific Technology] that would prove his innocence.

But he's had [a] fundamental understanding of the charges against him, of his attorneys, of the process, of the judges, of – what would happen in court . . . he had told me even back in 1999 that after his automatic appeals that he didn't want to pursue any post-conviction appeal. . . . I'm trying to convey that he had a detailed and rational understanding of what was going on in court in terms of his legal rights and liabilities.

Dr. Martell also opined that Mr. Reid was able to manage his personal affairs during the statute of limitations period because Mr. Reid had always been concerned about his personal appearance and health. While Dr. Martell considered Mr. Reid to be competent under *State v. Nix*, he said that he did not factor Mr. Reid's capacity to have rational consultations with his attorneys into the *State v. Nix* analysis because he considered the issue to be outside the scope of *State v. Nix*.

Dr. Bernet testified after Dr. Martell. Even though he had not examined Mr. Reid during the statutory limitations period, he offered his opinion that Mr. Reid was competent under *State v. Nix*. Dr. Bernet testified regarding Mr. Reid's long history of fabricating psychiatric symptoms, including the delusions of government surveillance. He recounted his interview with Mr. Reid in 1999, during which Mr. Reid told him about the origin of the Scientific Technology story and how he had been able to use the story to avoid prosecution.

Dr. Bernet also testified that Mr. Reid had been tested for, but not diagnosed with, a significant psychiatric disorder, prior to his arrest in Texas in 1977. Following his arrest, Mr. Reid acted flagrantly psychotic, but then was able to function normally on the streets following his release from custody. Dr. Bernet also reviewed Mr. Reid's grades at Volunteer State Community College, as well as the papers Mr. Reid had written while he was a student. He testified that he found no indication of psychotic thinking in these materials. However, Mr. Reid's symptoms resurfaced following his 1997 arrest in Tennessee. According to Dr. Bernet, this history illustrated a direct correlation between Mr. Reid's legal issues and his psychiatric symptoms.

While Dr. Bernet acknowledged the possibility that Mr. Reid could be genuinely delusional, Dr. Bernet believed that Mr. Reid's behavior differed significantly from that of the typical delusional patient and pointed toward malingering. Dr. Bernet thought that Mr. Reid's government surveillance fantasies were a defense mechanism and that maintaining the fantasy was more important to Mr. Reid than looking fully competent so he could stop

the appeals. Dr. Bernet also testified that Mr. Reid's defense mechanism about Scientific Technology and his desire to end his appeals were compatible in the sense that both prevented him from having to face awful facts about his crime.

Dr. Michael First, a psychiatrist and the editor of the DSM-IV and DSM-IV-TR,[62] testified in rebuttal. He had personally interviewed Mr. Reid and had reviewed various reports concerning Mr. Reid's mental condition. Dr. First was convinced that Mr. Reid was delusional and that, while these delusions could have been caused by brain damage, they could also have been caused by a non-organic delusional disorder. Dr. First testified that Dr. Bernet's conclusions could not be reconciled with Ms. Westfall's observations of Mr. Reid. Dr. First also took issue with Dr. Bernet's theory that Mr. Reid's delusions coincided with his legal troubles, and that Mr. Reid's behavior was incongruous with the typical delusional patient.

In its December 18, 2008 order, the Montgomery County court noted that the State had conceded in federal court that Mr. Reid was not competent under the *Rees v. Peyton* standard. The court stated, however, that the *State v. Nix* standard, rather than Tenn. Sup. Ct. R. 28, § 11, applied in the present proceeding and that Ms. Martiniano faced the burden of proving Mr. Reid's incompetence by clear and convincing evidence in light of *Reid v. State*, 197 S.W.3d at 703-05 and *In re Conservatorship of Groves*, 109 S.W.3d at 329-31.

Like the Davidson County court, the Montgomery County court employed *In re Conservatorship of Groves* as an analytical framework for determining Mr. Reid's competency under *State v. Nix*. The court found that *Groves* "provides an insightful dissection" of the "various components" of the *Nix* civil competency standard, and that "the core mental health concepts and interpretations" found in *Groves* were "equally applicable" in Mr. Reid's case. It also observed that *Groves* "established the parameters of this inquiry." In its discussion, the court "cite[d] extensively" the "core concepts" outlined in *Groves* before engaging in "application of the *Grove*[*s*] considerations to the facts of the present case." The Montgomery County court's recitation of *Groves* was similar to that of the Davidson County court. The court found that the issues underlying conservatorships and competency in capital post-conviction cases share "baseline concepts and public policy considerations." For example, autonomy is important in both contexts, and the law presumes in both contexts that adults are capable rather than incapable.

The Montgomery County court focused particularly on *Groves*'s discussion of functional and decision-making capacity. The court noted that competency is task-specific,

---

[62]One of the State's attorneys described Dr. First as "the single most qualified individual I've ever met in my life."

situational, and contextual, and that a person's competency level is not necessarily static. Significantly, the court said:

> Based on the nature of the proof, it is clear that the crux of the inquiry here is [Mr. Reid's] decision-making capacity. "Decision-making capacity involves a person's ability (1) to take in and understand information, (2) to process the information in accordance with his or her own personal values and goals, (3) to make a decision based on the information, and (4) to communicate the decision." [*Groves*, 109 S.W.3d] at 335.
>
> . . .
>
> Foolish, unconventional, eccentric, or unusual choices do not, by themselves, signal incapacity. However, choices that are based on deranged or delusional reasoning or irrational beliefs may signal decision-making incapacity.[" *Groves*, 109 S.W.3d] at 335-36.

The court, following *Groves*, defined decision-making capacity as the "mental ability to make a rational decision." It is therefore clear that the court considered the "crux" of this case to be Mr. Reid's "decision-making capacity," which the court defined as the "mental ability to make a rational decision."

To this end, the Montgomery County court began its analysis by exploring Mr. Reid's ability to manage his personal affairs in light of his "functional and decision-making capacit[ies]." While Drs. Bernet and Martell believed that Mr. Reid was able to manage his personal affairs during the statute of limitations period, Dr. Woods had testified that Mr. Reid believed his basic decisions were controlled by Scientific Technology. The court rejected Dr. Woods's testimony, and found "no basis to find a significant impairment, if at all, in [Mr. Reid's] functional or decision-making capacity to manage his personal affairs." Thus, the court found that Ms. Martiniano failed to satisfy the first prong of the *State v. Nix* standard.

The trial court noted that the second prong of the *State v. Nix* standard – Mr. Reid's understanding of his legal rights and liabilities – was "more difficult" to decide. The court again noted that it "utilize[d] the *Groves* considerations in this discussion." While Drs. Bernet and Martell found Mr. Reid to be competent, Dr. Woods did not. Although Dr. First challenged Dr. Bernet's findings on this issue, the court noted Dr. First's concession that delusional disorder is difficult to diagnose and that few cases are known.

The court also signaled that it would be required to make some "credibility determinations" in this case because Dr. First relied extensively on materials provided by Mr. Reid's advocates in the Office of the Post-Conviction Defender. The court observed that Dr. First's reliance on these materials warranted a degree of skepticism in light of the fact that the employees of the Office of the Post-Conviction Defender were "attempting to save their client's life." The trial court found it significant that Drs. Bernet and Martell, who had extensive histories with Mr. Reid, had concluded that Mr. Reid understood his legal rights and liabilities despite his repeated references to the delusions or fantasies of Scientific Technology. Therefore, the trial court "accredit[ed] their testimony in this regard" and held that Ms. Martiniano and the Office of the Post-Conviction Defender had failed to satisfy the second prong of the *State v. Nix* standard. Accordingly, the Montgomery County court held that Ms. Martiniano's petition, as her brother's "next friend," seeking post-conviction relief in the Baskin-Robbins case should be dismissed.

## V.

Three questions now await our decision. The first is what standard or standards should Tennessee's courts use to determine whether a prisoner is competent in the context of a post-conviction proceeding. The second is whether the trial courts employed the correct standard in these cases. If the trial courts employed the correct standard, the third and final question is whether the evidence in the record supports the trial courts' determination that Ms. Martiniano should not be permitted to pursue post-conviction relief as Mr. Reid's "next friend," because Mr. Reid is competent to make his own decisions regarding the pursuit of post-conviction relief.

## A.

We will first address the continuing need for two competency standards in the context of post-conviction proceedings. Counsel for the State and counsel for Mr. Reid argue that we should abandon the *State v. Nix* standard because it lacks a rationality component and is not tailored to the post-conviction context. Both parties agree that competency should hinge on whether the prisoner filing the petition for post-conviction relief is capable of making rational choices with regard to the particular issue in question. We agree.[63]

---

[63]See *Chico-Rodriguez v. State*, 114 P.3d 137, 140 (Idaho Ct. App. 2005), in which the Idaho Court of Appeals declined to adopt the *State v. Nix* standard when an inmate alleged that lack of mental competence should toll the statute of limitations for filing a petition for post-conviction relief. The court found the *State v. Nix* standard to be "unhelpful" because "the dispositive question" was not whether the inmate was able to manage his personal affairs, but "whether his mental illness prevented him from complying with the statute of limitation for filing a post-conviction action."

In the interest of uniformity and simplicity, we have determined that the standards and procedures in Tenn. Sup. Ct. R. 28, § 11 should henceforth be used in all post-conviction proceedings, including those currently awaiting decision, in which the issue of the petitioner's competency is properly raised. Thus, Tenn. Sup. Ct. R. 28, § 11 will apply not only when a petitioner seeks to withdraw a previously-filed petition for post-conviction relief, but also when a petitioner seeks to toll the statute of limitations in Tenn. Code Ann. § 40-30-102(a) due to incompetency, and when a "next friend" seeks to have the prisoner declared incompetent.[64]

In light of the importance our society ascribes to personal autonomy, the inquiry should begin with a presumption that the petitioner or prisoner is competent. Tenn. Sup. Ct. R. 28, § 11(B)(2); *Groves*, 109 S.W.3d at 329-30. To proceed on a "next friend" petition on the basis that the prisoner is incompetent, the "next friend" must make a prima facie showing that the prisoner is incompetent by submitting "affidavits, depositions, medical reports, or other credible evidence that contain specific factual allegations showing the petitioner's incompetence." *Holton v. State*, 201 S.W.3d at 634 (quoting *State v. Nix*, 40 S.W.3d at 464). The "next friend" must also demonstrate a "significant relationship" with the prisoner and must show that he or she is "truly dedicated to the best interests of the person on whose behalf he [or she] seeks to litigate." *Holton v. State*, 201 S.W.3d at 632. If this prima facie showing is made, then the trial court should schedule a hearing to determine whether the prisoner is competent to manage his petition. In the absence of a "next friend," the court may appoint a guardian ad litem to advocate on the petitioner's behalf. *See Reid v. State*, 197 S.W.3d at 696, 705-06. To assure adequate preparation for the competency hearing, "the trial court may enter a scheduling order requiring the parties to provide notice of any expert witnesses and to provide a written report of the expert[s'] opinions at a designated time prior to the hearing." *Reid v. State*, 197 S.W.3d at 703.

---

[64]As Judge Posner explained in *Holmes v. Buss*, 506 F.3d 576, 579 (7th Cir. 2007):

We do not think that creating different standards to govern the issue of competence to litigate . . . is a fruitful approach. The multiplication of rules and standards, carrying in its train as it does endless debate over boundaries, is one of the banes of the American legal system, a source of its appalling complexity. Whatever the nature of the proceeding, the test should be whether the defendant (petitioner, appellant, etc.) is competent to play whatever role in relation to his case is necessary to enable it to be adequately presented.

The test is unitary but its application will depend on the circumstances. They include not only the litigant's particular mental condition but also the nature of the decision that he must be competent to make.

The competency standard applicable to these proceedings is whether the prisoner possesses "the present capacity to appreciate [his or her] position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially affect the petitioner's capacity."[65] Tenn. Sup. Ct. R. 28, § 11(B)(1). The question is not whether the prisoner is able to care for himself or herself, but whether the prisoner is able to make rational decisions concerning the management of his or her post-conviction appeals. The prisoner (or the "next friend") bears the burden of proving incompetency by clear and convincing evidence. *Reid v. State*, 197 S.W.3d at 703-05.

To provide structure to its Tenn. Sup. Ct. R. 28, § 11 analysis, the trial court should employ the three-step *Rumbaugh* test:

> (1) Is the person suffering from a mental disease or defect?
>
> (2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?
>
> (3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?
>
> If the answer to the first question is no[;] the court need go no further, the person is competent. If both the first and second questions are answered in the affirmative, the person is incompetent and the third question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative; if yes, the person is incompetent, if no, the person is competent.

---

[65]The State has expressed concern over the potential indeterminacy of the word "may" in the Tenn. Sup. Ct. R. 28, § 11 standard. In our view, the word "may" simply acknowledges the eternal epistemological uncertainty that inhabits any attempt to ascertain the inner workings of an unfamiliar mind. Furthermore, as this case illustrates, the clear and convincing evidence standard obviates the possibility of equivocal results.

*Rumbaugh v. Procunier*, 753 F.2d at 398-99. The third step asks whether a prisoner, despite his or her mental disease or defect, is capable of making a rational choice from among the available post-conviction options. A decision may be rational even when it is not one that the majority would consider acceptable, sensible, or reasonable. A decision is rational when it is based on a process of reasoning. *Groves*, 109 S.W.3d at 336. A person's decision-making process is rational when that person can (1) take in and understand information; (2) process the information in accordance with his or her personal values and goals; (3) make a decision based on the information; and (4) communicate the decision. *Groves*, 109 S.W.3d at 335.[66]

**B.**

We next turn to the question of whether the trial courts applied the correct standard to determine whether Mr. Reid was competent to make decisions regarding the pursuit of post-conviction relief. Answering this question has been somewhat complicated by the procedural history of these cases.

In 2006, we unambiguously directed the trial courts to apply the "civil competency standard" found in *State v. Nix*, rather than the competency standard in Tenn. Sup. Ct. R. 28, § 11.[67] When read literally and superficially, the *State v. Nix* standard did not explicitly require considering whether the prisoner had the capacity to make rational decisions.

---

[66]The standard for determining competency to manage one's post-conviction appeals differs from the standards governing competency to stand trial and competency to be executed. Competency to stand trial depends on whether the defendant has "the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense." *State v. Reid*, 213 S.W.3d 792, 808 (Tenn. 2006) (quoting *State v. Black*, 815 S.W.2d 166, 174 (Tenn. 1991)). This is known as the *Dusky* standard or, in Tennessee, the *Mackey* standard. *See Dusky v. United States*, 362 U.S. 402, 402 (1960) (framing the competency test as "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [] and whether he has a rational as well as factual understanding of the proceedings against him"); *Mackey v. State*, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975). Competency to be executed depends on whether the prisoner has "a rational understanding of his conviction, his impending execution, and the relationship between the two." *State v. Irick*, 320 S.W.3d 284, 295 (Tenn. 2010) (quoting *Billiot v. Epps*, 671 F. Supp. 2d 840, 853 (S.D. Miss. 2009)). Although some states require a prisoner to be able to work with counsel in order to be competent to be executed, in *Van Tran* we adopted the less rigorous "cognitive test" described by Justice Powell in *Ford v. Wainwright*, 477 U.S. 399, 421-22 (1988) (Powell, J., concurring in part); *cf. Panetti v. Quarterman*, 551 U.S. 930, 954-61 (2007) (discussing the *Ford* competency standard). In *Van Tran*, we noted that once a conviction is final, "there is a lessened need for a defendant to assist in his or her defense given the availability of both state and federal collateral review of trial errors, and the expansion of the right to competent counsel at trial." *Van Tran v. State*, 6 S.W.3d at 266. The same rationale applies to post-conviction petitions, such as Mr. Reid's.

[67]*See Holton v. State*, 201 S.W.3d at 634-35; *Reid v. State*, 197 S.W.3d at 696, 702.

However, in their application of the *State v. Nix* standard, both trial courts infused their analysis of Mr. Reid's competency to pursue post-conviction relief with the rational decision-making principles found in *In re Conservatorship of Groves*. The *Nix*/*Groves* standard employed by the trial courts in these cases is functionally identical to the standard embodied in Tenn. Sup. Ct. R. 28, § 11(B)(1). Thus, the competency standard that both trial courts used in these cases is consistent with both *State v. Nix* and Tenn. Sup. Ct. R. 28, § 11.[68] Accordingly, we find that both trial courts employed the correct legal standard when they were called upon to decide whether Mr. Reid was competent to make decisions regarding the pursuit of post-conviction relief.

## C.

Our decision that the trial courts applied the correct legal standard to determine whether Mr. Reid was competent to make decisions regarding the pursuit of post-conviction relief leaves one question to be decided. We must now determine whether the record supports the trial courts' conclusions that Ms. Martiniano and the Office of the Post-Conviction Defender failed to prove clearly and convincingly that Mr. Reid lacked the capacity to decide whether to pursue post-conviction relief.

In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)); *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010). The truth of facts proved by clear and convincing evidence is "highly probable." *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009) (quoting *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 341 (Tenn. 2005)). Therefore, "clear and convincing evidence enables a fact-finder to form a firm belief or conviction regarding the truth of the facts." Whether the

---

[68]Following the testimony of Dr. Martell in the 2008 hearing in Davidson County, an assistant district attorney, perceiving that the trial court's inquiry had gone beyond *State v. Nix*, stated:

> If the Court please, we were a little bit concerned . . . obviously, the *Nix* standard is not real clear. Some of the questions Your Honor asked [Dr. Martell] about sound judgment, rational decisions, language like that that we didn't think . . . applied to [the] *Nix* standard. . . . It seemed like [your questions assumed] kind of a mixture between the *Rees* standard and the *Nix* standard, whether or not . . . [u]nderstanding your legal rights requires that you also would be exercising sound judgment or making rational decisions about those rights. We didn't think that *Nix* went that far.

Following these comments, the parties agreed to submit briefs on whether *State v. Nix* implicated rational decision-making.

evidence is clear and convincing is a question of law that appellate courts must review de novo without a presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).[69]

We find that the record supports the trial courts' conclusions that Ms. Martiniano and the Office of the Post-Conviction Defender did not present clear and convincing evidence that Mr. Reid is not competent to make decisions regarding post-conviction relief. Although they made out a prima facie showing of incompetence, the expert witnesses who testified at Mr. Reid's three competency hearings reached divergent conclusions concerning Mr. Reid's competency. Both courts found Drs. Martell and Bernet to be more credible than Dr. Woods. The Montgomery County court also expressed skepticism about Dr. First's analysis, despite the psychiatrist's impressive resumé.

Both trial courts found legitimate reasons to doubt that Mr. Reid was not competent to manage his appeals. Weighing the evidence and assessing the credibility of witnesses is the trial court's bailiwick, which we leave undisturbed. *Howell v. State*, 185 S.W.3d 319, 328 (Tenn. 2006) (citing *Nichols v. State*, 90 S.W.3d 576, 586 (Tenn. 2002)). As Dr. Bernet suggested, Mr. Reid may have been faking many of his delusions. As Dr. Martell suggested, Mr. Reid's delusions may have been sufficiently "encapsulated" to allow him to make rational post-conviction decisions. In light of these expert opinions, both of which are based on hours of personal interviews with Mr. Reid, it is unsurprising that the post-conviction courts harbored "serious or substantial doubt[s]" that Mr. Reid was incompetent. After reviewing Mr. Reid's voluminous post-conviction record, we find no compelling reason to overrule the trial courts' disposition of this issue.

Therefore, we affirm the holdings of the Davidson County and Montgomery County courts and of the Court of Criminal Appeals. Ms. Martiniano and the Office of the Post-Conviction Defender failed to prove, by clear and convincing evidence, that Mr. Reid was incompetent during the statute of limitations periods for the McDonald's and Baskin-Robbins cases and incompetent at the time of the hearing in the Captain D's case. We will not wrest Mr. Reid's autonomy from him under these circumstances.

---

[69]Tenn. Sup. Ct. R. 28, § 11(C) states that, on appeal from a Rule 28 competency hearing, "[t]he issue of competency will be reviewed as an issue of fact and the trial court's finding will be presumed correct, unless the evidence in the record preponderates against it." We have determined that, in harmony with Tenn. Code Ann. § 40-30-110(f) and *Groves*, incompetency is an "issue of fact" that must be established by clear and convincing evidence. Appellate courts should therefore review competency determinations using the same procedure we apply to other factual findings that require clear and convincing evidence. The reviewing court presumes the trial court's underlying factual findings are correct (unless the evidence preponderates against them), and then determines *de novo* whether these facts establish incompetency by clear and convincing evidence. *See* Tenn. R. App. P. 13(d) (2012); *In re Bernard T.*, 319 S.W.3d at 596-97.

**VI.**

Ms. Martiniano and the Office of the Post-Conviction Defender raise several additional issues on this appeal. We will deal with each of them in turn.

**A.**

Mr. Reid's advocates first insist that the State's concession in federal court that Mr. Reid is incompetent under the *Rees v. Peyton* standard should have preclusive effect in state court. Like the Court of Criminal Appeals, we find this argument unpersuasive. The circumstances in this case fail to satisfy the elements of res judicata, collateral estoppel, judicial estoppel, and equitable estoppel. *Reid v. State*, 2011 WL 3444171, at *29-31. We adopt the reasoning of the Court of Criminal Appeals on this issue and add three additional observations.

First, it is significant that the petitioner's burden of proving incompetency is higher in state court than in federal court. As previously noted, federal courts conduct the *Rees v. Peyton* inquiry under a "preponderance of the evidence" standard – the most lenient of all burdens of proof. *See Comer v. Schriro*, 480 F.3d 960, 970 (9th Cir. 2007); *Mason ex rel. Marson v. Vasquez*, 5 F.3d 1220, 1225 (9th Cir. 1993). In Tennessee state courts, by contrast, post-conviction petitioners must demonstrate incompetence by clear and convincing evidence, meaning that the court is left with no serious or substantial doubt concerning the correctness of the conclusions it derives from the evidence.[70] *Lane v. State*, 316 S.W.3d at 562.

Second, the record before us indicates that Mr. Reid's mental state was at its worst around the time the State first conceded his incompetency in federal court. Dr. Martell, for example, testified that in 2006, Mr. Reid's delusions had spilled out of his psychic "suitcase" and were permeating every area of Mr. Reid's life. In 2008, in contrast, Dr. Martell noted that Mr. Reid appeared much more rational. Mr. Reid's mind is a moving target. There is nothing irrational or dishonest in conceding incompetency when Mr. Reid was at his worst, but then contesting the issue when evidence suggested his mental health was improving.

---

[70]We note again that, in the 2007 Rule 28 hearings, the Davidson County post-conviction court found the standard of proof for Rule 28 inquiries to be unclear, but found it unnecessary to reach the issue because it decided the case on fairness grounds. To the extent that this issue may appear unresolved, we clarify that the clear and convincing evidence standards applies in all three types of post-conviction competency determinations at issue in this opinion. *See* Tenn. Code Ann. § 40-30-110(f).

Third, during the proceedings in federal court, the State anticipated that a different legal standard, the arguably more lenient *State v. Nix* standard, would be used in the state courts. We are, therefore, inclined to think that when the State conceded Mr. Reid's incompetence in federal court in 2006 and 2007, but contested the issue in state court in 2007 and 2008, this strategy was sensible under the circumstances and not inherently contradictory. The circumstances do not warrant the application of any sort of issue preclusion.

**B.**

Mr. Reid's advocates argue next that the trial judge who presided over the proceedings in Davidson County should have recused herself from the case because of an appearance of bias. Like the Court of Criminal Appeals, we find this issue to be without merit. *Reid v. State*, 2011 WL 3444171, at *39-41. This trial judge has shepherded these two complex cases for the past fifteen years. During that time, the judge has demonstrated exceptional patience, fairness, thoroughness, and attention to detail.

A trial judge's recusal decision will be reversed only when the judge has abused his or her discretion by failing to step aside. *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995) (citing *State ex rel. Phillips v. Henderson*, 220 Tenn. 701, 707, 423 S.W.2d 489, 492 (1968)). The arguments of Mr. Reid's counsel demonstrate no abuse of discretion. We affirm and adopt the reasoning of the Court of Criminal Appeals on this issue.

**C.**

Mr. Reid's advocates also take issue with the Davidson County court's denial of funding for other expert witnesses Mr. Reid's counsel hoped to call at the 2008 hearing.[71] The trial court concluded that funding for these additional witnesses would have been unnecessarily duplicative and could lead to an "endless cycle" of rebuttal testimony because all the experts were familiar with the reports of the other experts and because these experts had previously agreed that Mr. Reid was not competent.

Under Tenn. Code Ann. § 40-14-207(b) (2012) and Tenn. Sup. Ct. R. 13, § 5(a), a post-conviction court has discretion to provide funding for expert witnesses for an indigent capital petitioner when those services are "necessary to ensure that the constitutional rights of the defendant are properly protected." This Court has held that, to obtain this funding, "a petitioner must demonstrate by specific factual proof that the services . . . are necessary to establish a ground for post-conviction relief, and that the petitioner is unable to establish that

---

[71] In addition to Dr. Woods, the Office of the Post-Conviction Defender desired to call Drs. Xavier Amador, Ruben Gur, and Michael First.

ground for post-conviction relief by other available evidence." *Owens v. State*, 908 S.W.2d 923, 928 (Tenn. 1995). We agree with the Court of Criminal Appeals that the Davidson County court did not abuse its discretion in limiting the amount of funding available to Mr. Reid for expert services, and we adopt that court's reasoning. *Reid v. State*, 2011 WL 3444171, at *35-39.

**D.**

Mr. Reid's advocates contend that the Davidson County court erred by refusing to strike the testimony and evaluations of Drs. Bernet and Martell. They insist that the testimony of these experts should have been excluded because the State sent them to examine Mr. Reid without first notifying Mr. Reid's counsel when the examinations would take place.[72]

Because Mr. Reid's competency was at issue in this proceeding, the State was entitled to have him examined. Tenn. Code Ann. § 33-7-301(a)(2) (2007 & Supp. 2012). The State's attorneys previously indicated at a status conference that they anticipated having these evaluations done by these two psychiatrists. Although the State should ideally have informed Mr. Reid's counsel about the timing of the examinations, Mr. Reid's counsel has failed to identify any prejudice that resulted from this failure to communicate. We adopt the reasoning of the Court of Criminal Appeals on this issue, and find that the argument lacks merit. *Reid v. State*, 2011 WL 3444171, at *33-35.

**E.**

Finally, Mr. Reid's advocates object to Dr. Bernet's testimony and report under Tenn. R. Evid. 702 and 703. These rules govern the admission of expert testimony and instruct the court to disallow an expert's testimony if "the underlying facts or data indicate lack of trustworthiness." We provided guidelines for making this determination in *State v. Copeland*, 226 S.W.3d 287, 301-02 (Tenn. 2007) and *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 263-65 (Tenn. 1997).

Specifically, Mr. Reid's advocates object to the term "pseudologia fantastica" as a component of Dr. Bernet's diagnosis of Mr. Reid. The term first appears in the report Dr. Bernet prepared for the 2007 hearing. Counsel for Mr. Reid objected to the diagnosis before the 2007 and 2008 Davidson County hearings. The post-conviction court denied these

---

[72]Dr. Bernet interviewed Mr. Reid on April 11, 2008, and Dr. Martell met with Mr. Reid on April 22, 2008.

motions and allowed Dr. Bernet to testify.  Like the Court of Criminal Appeals, we find no abuse of discretion in the post-conviction court's decision to admit Dr. Bernet's testimony.

Even if "pseudologia fantastica" is a scientifically questionable diagnosis, Dr. Bernet explained during his testimony that he used the term because he considered it helpful to convey his conclusion that Mr. Reid habitually lied, malingered, and exaggerated his symptoms.  Once he realized that the term "created confusion" and became a "diversion" away from the issues, he decided the term was unnecessary and abandoned it.  Another expert, Dr. Martell, similarly testified that Mr. Reid sometimes exaggerated or fabricated his symptoms, and his testimony was never challenged for lack of reliability.  We adopt the reasoning of the Court of Criminal Appeals on this issue, and find Mr. Reid's counsel's arguments utterly without merit.  *Reid v. State*, 2011 WL 3444171, at *31-33.

## VII.

In summary, we have concluded that both the Davidson County court and the Montgomery County court applied the proper legal standard and analysis to determine whether Mr. Reid was competent to manage the pursuit of post-conviction relief with regard to his seven capital convictions.  We have also concluded that the record supports both courts' conclusion that Mr. Reid's "next friend" and the Office of the Post-Conviction Defender failed to present clear and convincing evidence that Mr. Reid is incompetent.  In light of the divergent diagnoses related to Mr. Reid's idiosyncratic behavior, it was not error for the courts to harbor serious or substantial doubt that Mr. Reid is actually incompetent to make decisions regarding post-conviction relief.  We have also decided that henceforth, all competency determinations made in the context of post-conviction proceedings shall be conducted using the competency standards contained in Tenn. Sup. Ct. R. 28, § 11 and discussed in this opinion.

Accordingly, the judgments of the courts below dismissing the petitions for post-conviction relief filed by Ms. Martiniano and the Office of the Post-Conviction Defender are affirmed.  Because Mr. Reid appears to be indigent, the costs of this appeal are assessed to the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUSTICE

-48-