IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 11, 2017 Session

## ROBERT WEBB v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 03-07591     James C. Beasley, Jr., Judge**

_____

### No. W2016-01820-CCA-R3-PC

_____

The Petitioner, Robert Webb, appeals the post-conviction court's denial of his petition for post-conviction relief as untimely upon its conclusion that the Petitioner's mental incompetence did not toll the statute of limitations. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Robert Webb.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Karen Cook, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

On November 30, 2005, the Petitioner pled guilty to first-degree murder, aggravated rape, aggravated burglary, and aggravated robbery in exchange for an effective sentence of life without the possibility of parole. See Robert Lewis Webb v. State, No. W2013-01250-CCA-R3-PC, 2014 WL 4244028, at *1 (Tenn. Crim. App. Aug. 27, 2014), perm. app. denied (Tenn. Jan. 20, 2015). Years later, on November 14, 2011, the Petitioner filed an untimely pro se petition for post-conviction relief, alleging that his guilty plea was involuntary, that his confession was coerced, that his trial counsel was ineffective, and that he possessed newly discovered evidence. Id. Counsel was

appointed to represent the Petitioner and filed an amended petition and additional pleadings, claiming that a new rule of constitutional law should be applied retroactively to the Petitioner's case, that the post-conviction statute of limitations should be tolled because the Petitioner was mentally incompetent during the time that the petition should have been filed, and that trial counsel gave the Petitioner both improper and insufficient advice. Id. at *1-2. The post-conviction court dismissed the petition without an evidentiary hearing, and this court remanded for a hearing to determine whether due process required that the statute of limitations be tolled. Id. Following an evidentiary hearing, the post-conviction court denied the petition, finding that due process did not require tolling of the statute of limitations in the Petitioner's case. The Petitioner appealed.

The proof presented at the July 7, 2016 evidentiary hearing is summarized below.

Betty Hutcherson testified that she served as the mental health coordinator at Whiteville Correctional Facility from 2003 until 2014. She had an educational background in mental health counseling, and she worked with doctors and other counselors to determine the best mental health treatment for inmates. She worked with the Petitioner from the time he arrived at the facility in February 2006 and had frequent interaction with him. The Petitioner was diagnosed with paranoid schizophrenia, had an IQ of 75 and was classified as mildly mentally retarded, and suffered from depression.

Ms. Hutcherson testified that the Petitioner was occasionally sent to the special needs facility in Nashville when his symptoms worsened. For instance, in March 2007, the Petitioner attempted suicide and was sent to the special needs facility until October 2008. Ms. Hutcherson agreed that the Petitioner resided in the Whiteville Correctional Facility "all of [20]06, a little bit tail end of [20]08, some of [20]09, five or six months of [20]09, and then from May through November of [20]11." He was eventually sent to the special needs facility permanently because his mental health condition had worsened.

Ms. Hutcherson testified that the Petitioner was "seriously and persistently mentally ill." His behavior was not consistent over the years – "[t]here were times that he was worse." The Petitioner's treatment plan involved compliance with taking his medication, including his medication for diabetes. He was also to meet with Ms. Hutcherson, a case manager, and a psychiatrist on a regular basis. During 2006, Ms. Hutcherson met with the Petitioner daily for fifteen to thirty minutes. At these meetings, she encouraged the Petitioner to have better hygiene and take his medication. Despite being diabetic, the Petitioner sometimes traded parts of his meals with another inmate for sweets. The Petitioner was prescribed an antipsychotic medication, as well as an antidepressant. At times the Petitioner was compliant with taking his medication; at other times he was not.

Ms. Hutcherson testified that the Petitioner's mental health deteriorated when he did not take his medication. It was during these periods that the Petitioner tried to commit suicide, which he attempted at least three or four times while at Whiteville Correctional Facility. Due to his mental health issues, the Petitioner was not capable of working a typical "prison job," but he was able to do a "medical or mental health incentive job" like feeding the fish in her fish tank. Ms. Hutcherson recalled that the Petitioner enjoyed playing cards with other inmates. However, he cheated during the games, and other inmates would "take advantage" of him by duping him out of commissary items. Other than participating in card games, the Petitioner was not social and stayed to himself. Ms. Hutcherson said that the Petitioner had limited reading and writing skills, and other inmates had to help him fill out requests for commissary, legal, or medical help. The Petitioner's medical records reflected that he had a second-grade reading level.

Ms. Hutcherson recalled that while the Petitioner was at the Whiteville prison, Carlito Adams, an inmate who provided legal services to other inmates, helped the Petitioner with legal work. In 2011, the Petitioner asked Ms. Hutcherson to write a letter describing his mental health issues. Ms. Hutcherson said that, in her opinion, the Petitioner was "very low functioning" and would not have been capable of performing his own legal work. She opined that, due to the Petitioner's mental illness and IQ, he would not have been able to understand legal issues or make rational decisions among his options.

Ms. Hutcherson testified that the Petitioner sometimes asked her to read letters to him from family members because he did not want other inmates reading his personal letters. She acknowledged that the Petitioner was able to follow simple instructions and that the first time he seriously attempted suicide was in March 2007.

Erin Giles-Wooden testified that she became the Petitioner's case manager at Whiteville Correctional Facility in August 2009. Ms. Giles-Wooden explained that she was responsible for 128 inmates, making sure they had the clothes they needed and placed any commissary orders correctly. She said that she kept a close eye on the Petitioner because of his past suicide attempts, but she had no contact with him during the time periods he was at the special needs facility. Ms. Giles-Wooden recalled that the Petitioner played cards all day and would cheat during the games. The other inmates knew that the Petitioner was cheating but would "play[] the card game with him because they knew already that that's what he needed[.]" The Petitioner also played bingo. At times, Ms. Giles-Wooden had to admonish the Petitioner about his lack of hygiene and to take his medication.

Ms. Giles-Wooden stated that the Petitioner had cellmates and that he sometimes got along with them, but other times he did not. She did not think that the Petitioner could read and write. Fellow inmates, Carlito Adams, Torry Nacho, and Andrew Harville, helped the Petitioner write letters and fill out slips to request commissary and medical help. Specifically, inmate Adams helped the Petitioner with legal work. She opined that the Petitioner could not do his legal work without the help of another person. Ms. Giles-Wooden did not know what medications the Petitioner was taking but noted that his behavior was very different when he did not take his medications. She estimated that the Petitioner "didn't take them more than he did." However, he was still intellectually low-functioning when taking his medication; his mood was just better. She recalled that the Petitioner had several serious suicide attempts while at Whiteville. When asked, Ms. Giles-Wooden stated that she was not qualified to say whether the Petitioner suffered from a mental disease or defect that would have prevented him from understanding his legal position and options available to him, or whether his mental disease or defect prevented him from making a rational choice among his options.

Dr. William Mays testified that he previously worked as a psychiatrist at DeBerry Special Needs Facility in Nashville. Although he did not personally remember the Petitioner, he met with him on five separate occasions in 2007 and 2009. The meetings occurred in the context of treatment team meetings, wherein Dr. Mays, a psychologist, and other treating professionals and staff met with the Petitioner as a group. Apart from those five meetings, Dr. Mays never saw the Petitioner, as he was not the primary treating psychiatrist for the Petitioner but was filling in for other doctors.

Dr. Mays stated that the first time he met with the Petitioner was within three days of the Petitioner's being transferred to DeBerry following a suicide attempt. He recalled that the Petitioner appeared "awake [and] alert" and was not showing any psychotic symptoms. The Petitioner seemed lucid, and his hygiene was not an issue. Dr. Mays switched the Petitioner from Haldol pills to long-acting Haldol injections. He said that, while at DeBerry, the Petitioner was mostly compliant with taking his medication. Dr. Mays stated that the Petitioner sometimes threatened suicide when he did not get what he wanted, for instance, if he was not permitted to buy snack foods at the commissary. He characterized the Petitioner's behavior as impulsive.

Dr. Mays stated that he did not know the Petitioner's IQ or reading level but, based on their interaction, considered the Petitioner "below average" intellectually. Dr. Mays thought that the Petitioner could "probably not" perform legal research or draft a legal petition on his own. However, Dr. Mays could not say whether the Petitioner's mental disease or defect prevented him from understanding his legal position and the options available to him. When asked if the Petitioner's mental disease or defect prevented him from making a rational choice among his options, Dr. Mays responded

that it would depend on the point in time – if he was stable and on his medication, he would most likely be able to make rational decisions. However, if the Petitioner was not taking his medication and "acutely psychotic or suicidal, then no."

Dr. Renee Glenn, a psychiatrist who treated the Petitioner at DeBerry during his intermittent stays at the special needs facility from March 2007 through September 2010, testified that the Petitioner came to the facility after attempting suicide. When the Petitioner first came to the facility, he was very unstable, depressed, and had low self-esteem. He also had periods of hallucinating. Dr. Glenn visited him several times a week until he was stable. The Petitioner's condition improved, and he moved to a unit at DeBerry with less supervision. While in this unit, the Petitioner worked cleaning the halls. Dr. Glenn recalled that the Petitioner's hygiene was adequate.

Dr. Glenn stated that the Petitioner was diagnosed with paranoid schizophrenia and had an IQ of 75, which was in the "borderline range." She said that he functioned at a below average level and read at a second grade level. Dr. Glenn opined that the Petitioner could not perform legal work without help. Dr. Glenn thought that the Petitioner's bad behavior when he was told that he would be returned to the Whiteville prison was partly manipulative and partly reactive. Asked whether she thought that the Petitioner's mental disease or defect prevented him from understanding his legal position and options available to him, Dr. Glenn replied, "I think it could have for sure, reading on a second grade level." Dr. Glenn further testified that the Petitioner's mental disease or defect could have prevented him from making a rational choice among his options, elaborating, "His insight into his mental illness and his medical illnesses were very poor so that's poor judgment." However, Dr. Glenn stated that the Petitioner was capable of expressing himself.

Carlito Adams, an inmate serving a life sentence for first degree felony murder, testified that he was diagnosed with paranoid schizophrenia and had a court-appointed conservator who made medical decisions for him. He and the Petitioner were both housed at DeBerry in 2007 and 2008. Mr. Adams recalled that the Petitioner generally stayed in his cell and needed help getting up for meals. The Petitioner also needed help from other inmates with filling out request forms to see the counselor or case manager or for commissary items. The Petitioner had "a good rapport with the nursing staff." Mr. Adams clarified that he did not see anyone help the Petitioner fill out commissary forms in 2007 but did so in 2008.

Mr. Adams recalled that he and the Petitioner did not begin to interact until a year after they first met. The Petitioner braided Mr. Adams' hair three or four times, during which they engaged in "[s]mall talk." Mr. Adams said that it was difficult to carry on a conversation with the Petitioner, elaborating that he "couldn't relate to him."

Mr. Adams testified that he was transferred to the Whiteville prison in 2008 or 2009. The Petitioner was soon transferred there as well, and they were in the mental health unit together. Mr. Adams recalled that the Petitioner mostly stayed in his cell, but when he did exit, "he would just sit around" and "seem[ed] like he was in his own world." He never saw the Petitioner playing cards, but he observed the Petitioner playing musical chairs with a counselor. The staff treated the Petitioner like a baby, and other inmates helped the Petitioner fill out requests for commissary or medical help. Mr. Adams and the Petitioner were eventually placed together as cell mates for a one-month period. During that time, the Petitioner was inactive and seemed depressed, "almost as if he had given up on life." The Petitioner did not discuss his case with Mr. Adams or ask him for legal help. The Petitioner was sent back to the special needs facility when he attempted to commit suicide.

Mr. Adams testified that, in 2010, he began to work as a legal assistant at the law library in the prison. He recalled that the Petitioner returned to Whiteville from the special needs facility in 2011. The Petitioner seemed the same when he returned. Mr. Adams asked the Petitioner about his convictions and why he had pled guilty. The Petitioner responded that his attorney had advised him that he would get the death penalty if he went to trial. Upon discussing the Petitioner's case, Mr. Adams realized that the statute of limitations had run on filing a petition for post-conviction relief. However, he told the Petitioner that he could still file a petition "if he could get newly discovered evidence or some constitutional ground that transpired during his guilty plea." When the Petitioner told Mr. Adams that he had a history of mental illness, Mr. Adams told the Petitioner to "go to the psychiatrist and see if she could do a mental health assessment on him regarding his mental health records that he had prior to his incarceration." Mr. Adams said that he directed the Petitioner to Ms. Hutcherson.

Mr. Adams testified that the Petitioner obtained a letter from Ms. Hutcherson, and Mr. Adams told the Petitioner that it constituted "newly discovered evidence of his mental state." He informed the Petitioner that he could file a petition for post-conviction relief. Mr. Adams signed up himself and the Petitioner to go to the law library to work on the petition and also for the Petitioner to see the attorney who worked at the prison. Mr. Adams and the Petitioner worked on the post-conviction packet together. They reviewed the questions together, and the Petitioner wrote down his answers. At some point, Mr. Adams took over writing the document and mailed it for the Petitioner. Mr. Adams said that he did not think the Petitioner could have completed the petition or performed his legal work without help. However, Mr. Adams admitted that after he told the Petitioner what information he needed to complete the petition, the Petitioner was able to obtain the information and write it down.

Craig Thompson, an inmate at DeBerry serving a life sentence, testified that he received a paralegal certificate in 1994. He met the Petitioner in 2009 or 2010, and his observation of the Petitioner was that he was "quiet and collective but [at the] same time . . . very sensitive about his life . . . who can help him out[.]" The Petitioner did not seem to be mentally slow to Mr. Thompson, his hygiene "was normal," and his communication skills were "[v]ery good." The two eventually started talking about the Petitioner's case, and Mr. Thompson helped the Petitioner file a petition for writ of habeas corpus. Mr. Thompson also wrote a letter to the federal judge, explaining that the Petitioner suffered from paranoid schizophrenia. Mr. Thompson did not think that the Petitioner could do his own legal work without help.

The Petitioner recalled that he pled guilty to first degree murder and other charges on November 30, 2005. He explained that he did not file a petition for post-conviction relief within the first year because his lawyer did not explain that basis of relief to him. The Petitioner said that, during his first year at the Whiteville prison, other inmates helped him write letters and fill out requests for commissary items. He heard voices and had suicidal thoughts during that year and, in March 2007, overdosed on his anti-depressant medication and was sent to the special needs facility.

The Petitioner testified that, while at the special needs facility, he met fellow inmate Craig Thompson, who brought up the idea of habeas corpus and drafted the pleadings. When he returned to the Whiteville prison, he and fellow inmate, Carlito Adams, began talking about his case. It was during these conversations that Mr. Adams told the Petitioner about post-conviction. Mr. Adams told the Petitioner to speak with Ms. Hutcherson, but the Petitioner came up with the idea of asking Ms. Hutcherson to write a letter for him. Mr. Adams helped the Petitioner draft and mail his post-conviction petition. The Petitioner's medical records were introduced as an exhibit at the post-conviction hearing.

## ANALYSIS

The Petitioner argues that the post-conviction court erred in finding that due process did not require tolling of the statute of limitations due to the Petitioner's mental incompetence.

Under the Post-Conviction Procedure Act, a claim for post-conviction relief must be filed "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of the petition shall be barred." Tenn. Code Ann. § 40-30-102(a).

The post-conviction statute contains a specific anti-tolling provision:

The statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file the action and is a condition upon its exercise. Except as specifically provided in subsections (b) and (c), the right to file a petition for post-conviction relief or a motion to reopen under this chapter shall be extinguished upon the expiration of the limitations period.

Id.

Subsection (b) of the statute sets forth the three narrow exceptions under which an untimely petition may be considered, none of which is applicable in this case. However, in addition to the statutory exceptions, our supreme court "has identified three circumstances in which due process requires tolling the post-conviction statute of limitations": (1) when a claim for relief arises after the statute of limitations has expired; (2) when a petitioner is prevented by his or her mental incompetence from complying with the statute's deadline; and (3) when attorney misconduct necessitates the tolling of the statute. Whitehead v. State, 402 S.W.3d 615, 622-23 (Tenn. 2013).

In determining whether the statute of limitations should be tolled due to a petitioner's incompetence, the question is "'whether the petitioner possesses the present capacity to appreciate the petitioner's position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially affect the petitioner's capacity.'" Reid ex rel. Martiniano v. State, 396 S.W.3d 478, 512-13 (Tenn. 2013) (quoting Tenn. Sup. Ct. R. 28, § 11(B)(1)). "The question is not whether the [petitioner] is able to care for himself or herself, but whether the [petitioner] is able to make rational decisions concerning the management of his or her post-conviction appeals." Reid, 396 S.W.3d at 513.

The inquiry begins with a presumption that the petitioner is competent. Id. at 512. The petitioner must then make a prima facie showing that he or she is incompetent "by submitting affidavits, depositions, medical reports, or other credible evidence that contain specific factual allegations showing the petitioner's incompetence." Id. If a prima facie showing is made, the post-conviction court will then "schedule a hearing to determine whether the [petitioner] is competent to manage his [or her] petition." Id. At the hearing,

-8-

the burden is on the petitioner to prove "that he or she is mentally incompetent by clear and convincing evidence." Id. at 494 (citing Tenn. Code Ann. § 40-30-110(f)).

In conducting its analysis, the trial court should ask the following questions:

(1) Is the person suffering from a mental disease or defect?

(2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

(3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

Id. at 513 (quoting Rumbaugh v. Procunier, 753 F.2d 395, 398-99 (5th Cir. 1985)).

A decision may be rational even when it is not one that the majority would consider acceptable, sensible, or reasonable. A decision is rational when it is based on a process of reasoning. A person's decision-making process is rational when that person can (1) take in and understand information; (2) process the information in accordance with his or her personal values and goals; (3) make a decision based on the information; and (4) communicate the decision.

Id. (internal citations omitted).

In finding that due process did not require tolling of the statute of limitations in the Petitioner's case, the post-conviction court found that the Petitioner was suffering from a mental disease or defect, but the disease or defect did not prevent him from understanding his legal options and the options available to him or prevent him from making a rational choice among his options. The Petitioner disputes the post-conviction court's findings.

The Petitioner points to the testimony of Ms. Hutcherson, who opined that the Petitioner's mental disease or defect prevented him from understanding his legal position and options available to him, and Dr. Glenn, who opined that the Petitioner's mental disease or defect "could have" prevented him from understanding his legal position. We initially note that Ms. Hutcherson's background is in counseling, not medicine; therefore, her opinion was not based on a qualified medical diagnosis. Moreover, the Petitioner's

behavior contradicted Ms. Hutcherson's conclusion in that she acknowledged that the Petitioner was able to follow simple instructions and that he did not attempt suicide until 2007, which was after the statute of limitations had expired. She also acknowledged that the Petitioner was compliant with taking his medication at times. Ms. Hutcherson's testimony falls short of establishing that the Petitioner was incapable of understanding his legal position and options or making rational choices among his options during the entire year of 2006.

In addition, Dr. Glenn's testimony that the Petitioner's mental disease or defect "could have" prevented the Petitioner from understanding his legal position also falls short of proving that the Petitioner was actually unable to understand his legal position. Dr. Glenn testified that the Petitioner was capable of expressing himself and that his bad behavior when he did not get his way was partly manipulative. Moreover, Dr. Glenn treated the Petitioner periodically between 2007 and 2010 and did not know him before that time. Therefore, Dr. Glenn's testimony does not address the Petitioner's mental condition or ability to understand his legal options during the statute of limitations period.

Furthermore, Dr. Mays, a psychiatrist that met with the Petitioner on five separate occasions in 2007 and 2009, surmised that if the Petitioner was stable on his medication, he would most likely be able to make rational decisions among his legal options. Dr. Mays recalled that the Petitioner was able to present himself and to be an effective communicator. This evidence does not support the Petitioner's contention that he was mentally incompetent during the year-long limitations period.

The Petitioner argues that the fact Mr. Adams and Mr. Thompson, fellow inmates, helped him with legal pleadings establishes that he was unable to understand his legal position and options available to him. In this regard, the post-conviction court found:

> Both inmates who testified during the hearing indicated that once they explained his rights to him he wanted to and did file appropriate pleadings not only in State Court but also in Federal Court. The fact that he needed their assistance to draft and compose the pleadings is not the test. The test is whether once explained to him he was capable of understanding his rights and acting upon them and this Court finds that he was.

This finding is supported by the record. Mr. Adams testified that once he explained to the Petitioner what information was needed to complete the post-conviction petition, the Petitioner was able to gather the necessary information. Mr. Thompson testified that he did not think the Petitioner was mentally slow but, rather, an effective communicator. The post-conviction court noted that the Petitioner "became involved with and sought out the two 'jail/house' lawyers while he was at the special needs unit after suicide attempts

possibly due to depression. There is nothing to indicate that he was not capable of understanding and making rational decisions about his case in 2006." The court noted that the Petitioner "was advised that the statute of limitations had run and that he would need a letter on his mental health condition and was able to secure same. He knew enough to seek out those who could help him and to follow their advice." The court concluded that "[t]here is nothing before this Court to indicate that he did not have the same ability to seek and understand the same information in 2006." The record supports the post-conviction court's conclusion that once the Petitioner was "confronted with his options[,] he was able to make rational choices on how to pr[oceed]."

The Petitioner argues that his mental incompetence prevented him from being aware of the one-year statute of limitations in a timely manner because, rather than going to the law library, he spent most of his time alone in his cell "feeling depressed, experiencing paranoid thinking, and contemplating suicide." He asserts that "the very fact that he suffers from paranoid schizophrenia and has delusions and hallucinations shows that he is not capable of making a rational choice among his options." However, "mental incompetence" for tolling purposes does not equate with "mental illness." Terry Lamar Byrd v. State, No. 03C01-9905-CR-00199, 2000 WL 217948, at *2 (Tenn. Crim. App. Feb. 25, 2000), perm. app. denied (Tenn. Mar. 19, 2001). Rather, "[m]ental incompetence denotes the inability to manage one's personal affairs or to understand one's legal rights and circumstances." Id. The Petitioner failed to establish that he was unable to understand his legal position or options, or to make rational choices among his options.

The Petitioner argues that he "would often not take his medication and would trade healthy foods for junk food. This type of behavior shows that [he] is an irrational person." We respectfully disagree with this assertion. If poor food choices and not following a doctor's orders proved mental incompetence, then a large percentage of the population could be deemed mentally incompetent. The Petitioner has to show that he was mentally incompetent with regard to making rational decisions among his legal options. Again, "[a] person's decision-making process is rational when that person can (1) take in and understand information; (2) process the information in accordance with his or her personal values and goals; (3) make a decision based on the information; and (4) communicate the decision." Reid, 396 S.W.3d at 513. As discussed above, the Petitioner was able to obtain necessary documentation to support his petition, provide information to the jailhouse lawyers regarding why he had pled guilty, determine that he wanted to file for post-conviction and habeas corpus relief, and communicate effectively. He, therefore, failed to establish by clear and convincing evidence that the statute of limitations should be tolled due to his alleged mental incompetence. The post-conviction court properly denied the petition.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE